## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | |
| **DAVID B. WELLIVER and DBLAINE CAPITAL, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

### SUMMARY

1.     The SEC brings this law enforcement action in response to fraud, breaches of fiduciary duties, and numerous other violations of the federal securities laws committed by Defendant David B. Welliver ("Welliver") and Defendant Dblaine Capital, LLC ("Dblaine Capital"), a registered investment adviser founded and controlled by Welliver.  Welliver and Dblaine Capital committed these violations at the expense of the investors in the Dblaine Fund (the "Fund"), a mutual fund that Welliver and Dblaine Capital advised.

2.     The misconduct began in October 2010, when Welliver and Dblaine Capital entered into an improper *quid pro quo* agreement in breach of their fiduciary duties to the Fund.  Specifically, in exchange for approximately $4 million in high-interest loans, Dblaine Capital agreed to invest significant Fund assets in "alternative investments" recommended by the lender.

From the start, this agreement was inappropriate because Welliver and Dblaine Capital were putting their own financial interests ahead of those of the Fund and its shareholders. For this reason, Welliver concealed the agreement from the Fund and its shareholders.

3.     Pursuant to the *quid pro quo* agreement, in December 2010 and April 2011, Welliver and Dblaine Capital directed the Fund to invest in an illiquid private placement offered by an affiliate of the lender. Welliver and Dblaine Capital made these investments even though they knew that they had not performed sufficient due diligence. Even worse, at the time of the April 2011 investment, Welliver and Dblaine Capital knew that increasing the Fund's investment in the private placement violated various investment restrictions and policies governing the Fund which were explicitly contained in the Fund's offering materials.

4.     Moreover, Welliver and Dblaine Capital fraudulently provided the Fund with inaccurate, inflated values for the private placement. According to the Fund's policies and its filings with the SEC, the private placement should have been valued at fair value according to policies approved by the Fund's Board of Trustees. However, from December 2010 to July 2011, Welliver, Dblaine Capital and the Fund made no effort to determine the private placement's fair value, and instead improperly valued the private placement at acquisition cost.

5.     Welliver's and Dblaine Capital's failure to provide an accurate value for the private placement resulted in the Fund misrepresenting the private placement's value in one of the Fund's filings with the SEC. In addition, the inflated value of the private placement holding was reflected in the Fund's daily net asset value ("NAV"), which it published daily for the Fund's shareholders and prospective investors on a publicly available website. As a result of Welliver's and Dblaine Capital's fraudulent valuation of the private placement, the Fund offered, sold, and redeemed shares at an inflated NAV.

6.      When Welliver and Dblaine Capital ultimately discovered that the private placement was in fact worthless, they continued their fraud by concealing this fact from the Fund's investors.

7.      While the Fund's investors suffered, Welliver enriched himself by spending at least $500,000 of the $4 million loans received by Dblaine Capital for his personal benefit, including spending the money on a new car, vacations, meals, home improvements, high-end department store purchases, jewelry, his son's college tuition, and the payment of back taxes.

8.      As a result of his misconduct, Welliver violated, and aided and abetted violations of, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-1], and Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-33(b)].  Moreover, Welliver aided and abetted violations of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)] and Sections 17(a)(2), 17(e)(1), and 22(e) of the Investment Company Act [15 U.S.C. §§ 80a-17(a)(2), 80a-17(e)(1), 80a-22(e)] and Rules 22c-1 and 38a-1 thereunder [17 C.F.R. §§ 270.22c-1, 270.38a-1].

9.      Similarly, as a result of its misconduct, Dblaine Capital violated, and aided and abetted violations of, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder, and Section 34(b) of the Investment Company Act. Moreover, Dblaine Capital violated Sections 206(1), 206(2), 206(3) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, and Sections 17(a)(2) and 17(e)(1) of the Investment

Company Act.  Dblaine Capital additionally aided and abetted violations of Exchange Act Rule 10b-5(b) and Section 22(e) of the Investment Company Act and Rules 22c-1 and 38a-1 thereunder.

10.     The SEC brings this lawsuit to hold Welliver and Dblaine Capital accountable for their flagrant and numerous violations of the federal securities laws and to prevent further harm to investors.  The SEC seeks permanent injunctions against Welliver and Dblaine Capital to enjoin them from any future violations of, or from aiding and abetting future violations of, the above-cited provisions of the federal securities laws.  The SEC further seeks an order requiring Welliver and Dblaine Capital to pay disgorgement, plus prejudgment interest, of all ill-gotten gains they received.  The SEC also seeks the imposition of civil penalties against Welliver and Dblaine Capital pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Sections 21(e) and  27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14], and Sections 42(d) and 44 of the Investment Company Act [15 U.S.C. §§ 80a-41(d) and 43].

12.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, Section 214 of the Advisers Act, and Section 44 of the Investment Company Act.

13.     The acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere.

14.     Welliver and Dblaine Capital, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, transactions, practices, and courses of business alleged herein.

## DEFENDANTS

15.     **David B. Welliver**, age 51, is a resident of Buffalo, Minnesota.  Welliver founded Dblaine Capital in 2005, and has served as the firm's Chief Executive Officer and Chief Investment Officer during most of its existence.  At all relevant times, he has had sole control of Dblaine Capital's operations and advisory services.  Welliver also served as the portfolio manager for and investment adviser to the Fund and the Dblaine Investment Trust ("Trust"), a registered investment company that is comprised of two series funds, including the Fund. Welliver additionally was the President, CEO, Treasurer, Chief Financial and Accounting Officer, Secretary, and Chairman of the Board of Trustees of the Fund and the Trust.

16.     **Dblaine Capital, LLC** is an investment adviser based in Buffalo, Minnesota, registered with the SEC under the Advisers Act since 2008.  At all relevant times, it served as the investment adviser to the Fund and the Trust.  Dblaine Capital also serves as adviser to certain separate account portfolios.

## RELEVANT ENTITIES

17.     **The Dblaine Investment Trust** is an open-end management investment company, registered with the SEC under the Investment Company Act since December 2009.

The Trust is organized as an Ohio business trust, and is a pooled investment vehicle within the meaning of Advisers Act Rule 206(4)-8 [17 C.F.R. 275.206(4)-8]. The Trust is comprised of two series funds, including the Fund, both of which were advised by Welliver and Dblaine Capital. The Boards of Trustees of the Fund and Trust are comprised of the same individuals, including Welliver.

18.    As investment advisers, Welliver and Dblaine Capital owed fiduciary duties to the Trust, the Fund, and their other advisory clients. These duties included the duty of fair and honest dealing, the obligation to act in their clients' best interests, the duty to employ reasonable care to avoid misleading clients, and the duty to disclose all material facts to their clients.

## FACTS

### A.    Welliver's History of Misconduct in the Financial Services Industry

19.    Prior to the formation of Dblaine Capital, Welliver had a history of misconduct in the financial services industry.

20.    In 1998, the Minneapolis Police Relief Association and the Minneapolis Fire Fighters Relief Association sued Welliver, alleging that he, as the adviser to their pension funds, fraudulently mismanaged fund assets and breached his fiduciary duties by making unsuitable investments for the funds. In 2000, Welliver was ordered to pay a $14.6 million judgment in that action.

21.    In 2003, Welliver was charged with two felony counts for failure to file IRS Employee Benefit Plan forms. He later pled guilty to two misdemeanor counts relating to that misconduct.

22.    In 2004, the U.S. Department of Labor filed a civil complaint against Welliver alleging that he illegally transferred funds from his company's retirement savings plan to his

personal bank account.  Welliver consented to a judgment in that action, which enjoined him from violating certain ERISA provisions and required him to pay $19,161.

**B.    Welliver Paid Himself Handsomely Despite Dblaine Capital's Failing Business**

23.    At all relevant times, Dblaine Capital's business has been unsuccessful.

24.    In 2009 and 2010, Dblaine Capital had only a handful of advisory clients and generated less than $7,000 per year in advisory fees, its only revenues.

25.    Nevertheless, during these years, Welliver paid himself a generous six-figure salary.  During those years, Welliver also spent an additional $500,000 of Dblaine Capital funds on goods and services for his personal benefit, including travel, liquor, meals, clothing, and home furnishings.  The funds he received from Dblaine Capital were Welliver's only significant source of income.

26.    In an effort to grow Dblaine Capital's business and generate increased advisory fees, Welliver decided to create a mutual fund that Dblaine Capital would advise.  In December 2009 he formed the Trust which, at the time, was comprised of a single mutual fund:  the Fund.

**C.    The Fund's Investment Policies and Restrictions**

27.    The Fund's Prospectus describes the Fund as a diversified fund with an investment objective of growth and income.  The Fund's Prospectus further provides that the Fund will, under normal circumstances, invest primarily in equity securities that are trading below their fair value, as determined by the adviser, Dblaine Capital.

28.    According to the Fund's Prospectus, the Fund's adviser, Dblaine Capital, employs a proprietary model that uses "exhaustive fundamental and technical analysis, and company-by-company research" to identify potential investments.

29.     According to the Fund's Statement of Additional Information ("SAI"), the Fund is subject to the following investment restrictions which respectively relate to portfolio concentration, diversification, and illiquid investments:

     a.  the Fund will not invest 25% or more of its total assets in a particular industry or group of industries,

     b.  the Fund will not invest more than 5% of its total assets in the securities of a single issuer; and

     c.  the Fund will not hold 15% or more of its net assets in illiquid securities.

30.     The Fund's Prospectus and SAI were included in the registration statement the Trust filed with the SEC on December 30, 2010.  Welliver signed that registration statement in his capacities as Trustee, President, Principal Executive Officer, Treasurer, and Principal Financial and Accounting Officer of the Trust.

**D.     Dblaine Capital's Obligation to Comply with the Fund's Investment Policies**

31.     The Fund's Compliance Manual states that the Fund's adviser, Dblaine Capital, is required to invest the Fund's assets in accordance with the Fund's investment objectives, strategy, policies, and other limitations set forth in the Fund's Prospectus and SAI.

32.     According to Dblaine Capital's Compliance Manual, the Fund's portfolio manager, Welliver, is responsible for ensuring, on a daily basis, that the Fund is complying with its investment restrictions, "as defined by applicable law and regulation and/or disclosure in offering documents."

33.     As the Fund's portfolio manager, Welliver had sole responsibility for selecting investments for the Fund.

34.     Welliver reviewed, approved, and understood the Fund's investment policies and restrictions described above, including the restrictions on concentration, diversification, and

illiquid investments.  He also reviewed and approved the Fund's Compliance Manual and

Dblaine Capital's Compliance Manual.

### E.      The Fund's Valuation Policies

35.     According to the Fund's Prospectus and its Form N-CSR (Certified Shareholder

Report of Registered Investment Companies), which the Trust filed with the SEC on May 9,

2011 ("Form N-CSR"), the Fund's assets are generally valued at their market prices.  For assets

for which market prices are not readily available, the Prospectus states that "the adviser [Dblaine

Capital] will value the Fund's assets at their fair value according to policies approved by the

Fund's Board of Trustees."  Similarly, the Form N-CSR states that the Fund "has a policy that

contemplates the use of fair value pricing to determine the NAV per share of the Fund when

market prices are unavailable," and that any fair value pricing method used "will be approved by

the Board and results will be monitored to evaluate accuracy."

36.     Welliver reviewed and approved the Form N-CSR.  He also signed that filing in

his capacity as President and Principal Financial Officer of the Trust.  The documents the Trust

filed with the SEC—including the Fund's Prospectus, SAI, and Form N-CSR—are publicly

available and can be accessed through the SEC's website.

37.     The Fund's Compliance Manual, which Welliver reviewed and approved, states

that the Fund's Fair Value Procedures will be performed and monitored by a Fair Value

Committee designated by the Fund's Board of Trustees.  The Fund's Fair Value Procedures,

which are set forth in the Fund's Compliance Manual, charge the adviser, Dblaine Capital, with

the responsibility of providing the Fair Value Committee with a valuation recommendation,

specifying the information supporting the recommendation, and documenting each valuation and

the factors that entered into the valuation.

38.     Despite the requirements of the Fund's Compliance Manual and Fair Value Procedures, Welliver knew that the Fund never established a Fair Value Committee or any other committee to oversee pricing and valuation.

**F.      Welliver's Need for Money Causes Dblaine Capital to Enter a *Quid Pro Quo* Financing Agreement at the Expense of the Fund's Shareholders**

39.     Throughout most of 2010, the Fund's only investors were a small number of Dblaine Capital's advisory clients who had moved a portion of their separate account assets, collectively totaling approximately $500,000, into the Fund.

40.     In early 2010, Welliver decided to grow the Fund beyond its handful of investors, which would increase Dblaine Capital's advisory fees.

41.     In order to increase the Fund's net assets, Welliver planned to merge the Fund with other mutual funds.

42.     Pursuant to his plan, in March 2010 Welliver struck the following deal with the principals of another investment adviser:  In exchange for payment of $200,000 by Dblaine Capital, the other adviser's principals would facilitate a merger whereby the Fund would acquire the assets of two mutual funds advised by the other investment adviser (the "Merger Funds").

43.     However, because Dblaine Capital's advisory business was unsuccessful, it lacked the capital to facilitate the merger between the Fund and the Merger Funds.  Indeed, as of June 30, 2010, Dblaine Capital had less than $10,000 in liquid assets.

44.     Unable to locate a conventional source of funding, Welliver caused Dblaine Capital to enter into a financing agreement with a firm called Lazy Deuce Capital Co., LLC ("Lazy Deuce").  On October 20, 2010, Welliver signed that agreement on behalf of Dblaine Capital.

45.     Under the agreement, Dblaine Capital agreed to invest Fund assets in securities recommended by Lazy Deuce that are "considered to be alternative investments."  In exchange, Lazy Deuce agreed to provide loans to Dblaine Capital.  By accepting the loans, Dblaine Capital was being compensated for allowing Lazy Deuce to choose the Fund's investments, regardless of whether Lazy Deuce's chosen investments were in the best interest of the Fund's shareholders.

46.     Welliver did not inform the Fund's Board of Trustees about Dblaine Capital's agreement with Lazy Deuce or about the inherent conflict of interest it posed.  Welliver and Dblaine Capital likewise concealed the agreement from the Fund's shareholders.

47.     Between October 2010 and May 2011, Dblaine Capital borrowed approximately $4 million from Lazy Deuce by executing 27 promissory notes, which Welliver signed on behalf of Dblaine Capital.  The promissory notes are each for a term of one year with an annual interest rate ranging from 15% to 18%, with the interest payments for each note due within the first three months of each note's issuance.

48.     As a result of the first tranches of the Lazy Deuce loans, by early December 2010 Welliver and Dblaine Capital had secured sufficient funds to finance the merger between the Fund and the Merger Funds.  By December 13, 2010, following a $100,000 payment from Dblaine Capital to the principals of the Merger Funds' adviser, the merger was effectuated.  As a result of the merger, the Fund's assets increased from approximately $500,000 to over $9 million.

49.     Welliver spent a significant portion of the Lazy Deuce loans for his own personal benefit.  Indeed, by May 31, 2011, Welliver had spent at least $500,000 of the $4 million for personal expenditures, either by funneling the Lazy Deuce money to his personal bank account or by making a variety of purchases using Dblaine Capital checks and credit cards.  Welliver's

personal expenditures included vacations, meals, home improvements, high-end department store purchases, jewelry, his son's college tuition, and the payment of back taxes.  Welliver also used money from the Lazy Deuce loans to purchase a $40,000 new car, which he charged directly to Dblaine Capital.

G.     **Within Days of the Merger, Welliver Invests the Fund's Assets in an Illiquid Private Placement Recommended by Lazy Deuce**

50.     In return for the loans, Welliver and Dblaine Capital directed the Fund to invest in the alternative investment recommended by Lazy Deuce:  a private placement offering by Semita Partners, LLC ("Semita").

51.     Semita was founded in August 2010, and is controlled by several principals of Lazy Deuce.

52.     According to its private placement memorandum ("PPM"), Semita is engaged in the business of commercial lending, "based on alternative and other less tangible assets."  The PPM further describes the Semita securities as "restricted," and Welliver understood Semita to be an "illiquid" investment under the terms of the Fund's offering materials.

53.     Welliver did not research or consider any alternative investment for the Fund other than Semita.  Moreover, prior to making the Semita investment, Welliver's only due diligence consisted of reviewing the Semita PPM—which consists mostly of boilerplate language and provides little information about Semita or its business—and speaking with Semita/Lazy Deuce's principals.  Welliver knew that it was inappropriate to invest the Fund's assets based on such a scant level of due diligence.  He also knew that, contrary to the Fund's Prospectus disclosure, Dblaine Capital did not conduct an "exhaustive fundamental and technical analysis" before investing the Fund's money in Semita.

54.     Despite Welliver's insufficient due diligence, on December 16, 2010, Welliver, on behalf of the Fund, signed an agreement for the Fund to purchase 1 million Semita units at $1 per unit.  On December 16 and 17, 2010, the Fund made its first investments in Semita, purchasing a total of 900,000 units for $900,000.

### H.     Following a Wave of Redemptions, the Fund's Semita Holding Exceeds the Fund's Investment Limitations

55.     Shortly after the Fund's merger with the Merger Funds and its initial investments in Semita, the Fund experienced significant redemptions.  Fund shareholders who had formerly been advisory clients of the Merger Funds' adviser withdrew from the Fund *en masse*.  Welliver also moved all of his pre-merger advisory clients out of the Fund.

56.     In December 2010, with the exception of Semita, Welliver had invested the Fund's $9 million in a diversified large-cap portfolio.  However, in order to meet the rapid wave of redemption requests, the Fund sold most of its large-cap portfolio holdings and placed the proceeds in a money market account.

57.     As a result of the redemptions, by January 5, 2011, the Fund's reported net assets had declined to $3.4 million.  This included the Semita investment, whose value the Fund reported at $900,000.  The Fund's Semita holding now comprised over 26% of the Fund's reported net assets, which exceeded the Fund's investment limitations described above in Paragraph 29 relating to diversification, concentration, and illiquid securities.

58.     In January 2011, Welliver became aware that the Fund's Semita holding exceeded the Fund's diversification, concentration, and illiquid securities investment limitations.

59.     For the next several months, Welliver made several unsuccessful attempts to sell the Fund's Semita holding, including attempts to sell the investment back to Lazy Deuce.  Welliver's inability to sell the Semita investment, as well as his failed attempts to gain

information about Semita's business from its principals, caused Welliver to have serious

concerns about the Semita investment.

60.     Meanwhile, the redemptions continued.  By March 31, 2011, the Fund's reported

net assets had dwindled to approximately $2.4 million.  The Fund's only holdings were the

$900,000 Semita investment, which had grown to over 37% of the Fund's reported assets, and

$1.5 million in a money market account.

**I.      In Order to Receive Additional Lazy Deuce Loans, Welliver Fraudulently
         Makes Additional Semita Investments for the Fund**

61.     By April 1, 2011, Dblaine Capital was again running low on money and needed

additional loans from Lazy Deuce.  However, Lazy Deuce was unwilling to loan Dblaine Capital

more money unless the Fund purchased additional Semita units.

62.     On April 1 and 15, 2011, despite growing reservations about Semita, Welliver

directed the Fund to purchase a total of 825,000 additional Semita units for $825,000.  Welliver

directed the Fund to make these purchases even though he knew that the Fund's existing position

in Semita exceeded the Fund's limitations on concentration, diversification, and illiquid

investments.

63.     At the time of the Fund's April 2011 Semita investments, Welliver knew that

these investments violated the Fund's investment policies, were improper, and were not in the

best interest of the Fund's shareholders.  Welliver and Dblaine Capital did not disclose any of

this to the Fund's Board or shareholders.

64.     Shortly after the Fund's April 2011 Semita investments, Lazy Deuce loaned

Dblaine Capital an additional $1.1 million at an annual interest rate of 15%.

65.     All the while, the Fund continued to receive redemption requests.  As a result, the

Fund soon ran out of liquid assets to meet the requests.

66.     On May 27, 2011, in an effort to provide liquidity to the Fund, Welliver directed Dblaine Capital to purchase 500,000 Semita units directly from the Fund for $500,000, leaving the Fund with 1,225,000 Semita units.  Dblaine Capital purchased the 500,000 Semita units while acting as a principal for its own account.

67.     Dblaine Capital did not provide proper written disclosure of this transaction, nor did it obtain the proper consent to the transaction.

68.     Dblaine Capital financed its $500,000 Semita purchase with a $600,000 loan from Lazy Deuce with an annual interest rate of 18%.  This was the last loan that Lazy Deuce provided to Dblaine Capital.

**J.     The Fund's Incorrect Valuation of its Investment in Semita**

69.     Welliver knew that the Semita units were illiquid securities with no readily available market price.

70.     For this reason, according to the Fund's valuation policies, the Fund should have valued the Semita units at fair value pursuant to policies approved by the Fund's Board of Trustees.  Instead, Welliver simply valued the Semita units at their cost upon acquisition:  $1 per unit.  Welliver never made any attempt to calculate a fair value for the Semita holdings and never revisited Semita's valuation until late June 2011.

71.     The Fund's Form N-CSR, which the Trust filed with the SEC on May 9, 2011, assigned the Semita investment, as of February 28, 2011, a value of $900,000.  This valuation was false and misleading because Welliver had concerns about Semita, had unsuccessfully tried to sell the investment back to Lazy Deuce, and knew that the Fund had made no effort to calculate a fair value for the Semita holding, as was required by the Fund's policies.

72.     On or around June 22, 2011, a principal of Lazy Deuce told the Chief Compliance

Officer of the Fund and Dblaine Capital (the "CCO") that:  the Semita units were worthless,

Semita had no operations, and all of the money Semita had received from the Fund had been

transferred to Lazy Deuce, which in turn distributed the funds to Lazy Deuce's shareholders.

73.     Around this time, the Fund's only asset other than the Semita units was

approximately $3,000 in a money market fund.

74.     On June 26, 2011, the CCO shared the information he had learned about Semita

with Welliver.  The CCO told Welliver to apprise the Fund's trustees of the situation, write the

value of the Semita holding down to zero, and notify the SEC.  Welliver failed to do any of these

things.

75.     On June 28, 2011, the CCO sent an email to the Fund's Board of Trustees,

including Welliver, urging them to devalue the Semita holding and to notify the SEC.  The CCO

also advised the trustees that if they failed to take these actions by the end of the day, the CCO

would contact the SEC himself.

76.     Welliver and the Fund's Board of Trustees likewise failed to take any of the

CCO's recommended actions.  Instead, they closed the Fund to new investments and retained an

independent consultant to investigate the matter.

77.     On July 8, 2011, the independent consultant advised the Fund's Board of Trustees

to take a 100% loss reserve for the Semita investment, effectively valuing the holding at zero.

78.     Notwithstanding these developments, the Fund's Board of Trustees failed to take

any impairment on the Semita holding until July 18, at which time the Fund re-priced the Semita

holding at zero.

79.     On the preceding Friday, July 15, the Fund reported assets of $1,249,501.48 and an NAV of $11.64.  On Monday, July 18, following the re-pricing, the Fund reported total assets of $24,457.45 and an NAV of $0.23.

80.     From on or about December 16, 2010, to on or about July 15, 2011, the Trust offered, sold, and redeemed Fund shares to investors.  Throughout this period, the Fund's mispricing of the Semita units, which was based on prices that Welliver and Dblaine Capital provided to the Fund, was reflected in the Fund's daily NAV.  Therefore, throughout this period, the Trust offered, sold, and redeemed Fund shares at inaccurate NAVs.  Welliver and Dblaine Capital never disclosed this to the Fund's Board, the Trust's Board, or the Fund's shareholders.

81.     Moreover, throughout this period, the Trust failed to provide any meaningful oversight over its investment advisers, Welliver and Dblaine Capital.

**K.      The Fund Suspends Redemptions and Undertakes Liquidation**

82.     On Thursday, July 14, 2011, a shareholder attempted to redeem approximately $30,000 of Fund shares.  Under Investment Company Act Rule 22c-1, the redemption request should have been processed at the next calculated NAV, which on Friday, July 15, 2011, was $11.64.  However, because the Fund had insufficient assets, its transfer agent informed the redeeming shareholder that it could not process the order.  As a result, the Trust effectively suspended Fund redemptions, even though it never applied for an order from the SEC to suspend redemptions.

83.     As of August 11, 2011, the Fund had approximately 80 shareholders and reported net assets of approximately $54,000 and an NAV of $0.49.

84.     On August 11, 2011, the Fund's Board of Trustees voted to liquidate the Fund.

**L.      The Trust Made Numerous Misrepresentations in SEC Filings**

85.      As described above, the Trust made representations in the Fund's Prospectus about the Fund's investment policies relating to its restrictions on diversification, concentration, and illiquid securities.  However, in April 2011, Welliver and Dblaine Capital caused the Fund to purchase additional Semita units, knowing that those additional investments violated the Fund's investment policies and restrictions.  Thus, Welliver, Dblaine Capital and the Trust—through Welliver—knew that the Trust was falsely representing that the Fund would abide by its investment restrictions.

86.      In addition, the Trust made misrepresentations about the Fund's fair value policies in the Fund's Prospectus and Form N-CSR.  Specifically, the Trust stated that for securities with no readily available market value, the Fund "will value the Fund's assets at their fair value according to policies approved by the Fund's Board of Trustees."

87.      As described above, however, the Fund failed to ascertain a fair value for its Semita holding, failed to establish a Fair Value Committee, and failed to comply with fair value policies approved by the Fund's Board of Trustees.  Thus, Welliver, Dblaine Capital and the Trust—through Welliver—knew that the Trust's representations about the Fund's valuations practices and policies were false.

88.      Finally, as described above, the Trust disclosed an inaccurate value for the Semita holdings in its Form N-CSR.

89.      Welliver signed each of the Trust's SEC filings containing the false representations described above.

## COUNT I

### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT
### [15 U.S.C. §77q(a)(1)]
(Against Welliver and Dblaine Capital)

90.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

91.     By their conduct, Welliver and Dblaine Capital, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, have employed devices, schemes or artifices to defraud.

92.     Welliver and Dblaine Capital acted with scienter.

93.     By reason of the foregoing, Welliver and Dblaine Capital violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### AIDING AND ABETTING VIOLATIONS OF
### SECTION 17(a)(1) OF THE SECURITIES ACT [15 U.S.C. §77q(a)(1)]
(Against Welliver and Dblaine Capital)

94.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

95.     By its conduct, the Trust, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, has employed devices, schemes or artifices to defraud.

96.     Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

97.     Welliver, Dblaine Capital, and the Trust acted with scienter.

98.     By reason of the foregoing, the Trust violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## COUNT III

### VIOLATIONS OF SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]
(Against Welliver and Dblaine Capital)

99.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

100.    By their conduct, Welliver and Dblaine Capital, in the offer or sale of securities, by the use of any means or instruments of transportation and communication in interstate commerce and by the use of the mails, directly or indirectly, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in transactions, practices or courses of business that have been operating as a fraud or deceit upon purchasers of securities.

101.    By reason of the foregoing, Welliver and Dblaine Capital violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

### AIDING AND ABETTING VIOLATIONS OF SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]
(Against Welliver and Dblaine Capital)

102.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

103.    By its conduct, the Trust, in the offer or sale of securities, by the use of any means or instruments of transportation and communication in interstate commerce and by the use of the mails, directly or indirectly, has obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or has engaged in transactions, practices or courses of business that have been operating as a fraud or deceit upon purchasers of securities.

104.    Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

105.    By reason of the foregoing, the Trust violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## COUNT V

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. §78j(b)] AND RULE 10b-5 THEREUNDER [17 C.F.R. §240.10b-5]
(Against Welliver)

106.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

107.    By his conduct, Welliver, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

and (c) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

108.    Welliver acted with scienter.

109.    By reason of the foregoing, Welliver violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT VI

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. §78j(b)] AND RULES 10b-5(a) and (c) THEREUNDER [17 C.F.R. §240.10b-5(a) and (c)]
(Against Dblaine Capital)

110.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

111.    By its conduct, Dblaine Capital, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; and (b) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

112.    Dblaine Capital acted with scienter.

113.    By reason of the foregoing, Dblaine Capital violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5 (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

## COUNT VII

### AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. §78j(b)] AND RULE 10b-5 THEREUNDER [17 C.F.R. §240.10b-5]
(Against Welliver and Dblaine Capital)

114.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

115.    By its conduct, the Trust, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

116.    Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

117.    Welliver, Dblaine Capital, and the Trust acted with scienter.

118.    By reason of the foregoing, the Trust violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §2 40.10b-5], and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT VIII

### VIOLATIONS OF SECTIONS 206(1) and 206(2) OF THE ADVISERS ACT
### [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]
(Against Welliver and Dblaine Capital)

119.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

120.     By their conduct, Welliver and Dblaine Capital, while acting as investment advisers, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, knowing or recklessly:  (a) employed devices, schemes, or artifices to defraud their clients or prospective clients; and (b) engaged in transactions, practices, and courses of business that operated or would have operated as a fraud or deceit upon clients or prospective clients.

121.     Welliver and Dblaine Capital acted with scienter.

122.     By reason of the foregoing, Welliver and Dblaine Capital violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## COUNT IX

### AIDING AND ABETTING VIOLATIONS OF SECTIONS 206(1) and 206(2) OF THE
### ADVISERS ACT [15 U.S.C.  §§ 80b-6(1) and 80b-6(2)]
(Against Welliver)

123.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

124.     By its conduct, Dblaine Capital, while acting as an investment adviser, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, knowing or recklessly:  (a) employed devices, schemes, or artifices to defraud their clients or prospective clients; and (b) engaged in transactions, practices, and courses of business that operated or would have operated as a fraud or deceit upon clients or prospective clients.

24

125.    Welliver knowingly or recklessly provided substantial assistance to Dblaine Capital in the commission of these violations.

126.    Welliver and Dblaine Capital acted with scienter.

127.    By reason of the foregoing, Dblaine Capital violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)] and Welliver is liable for aiding and abetting those violations pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## COUNT X

**VIOLATIONS OF SECTIONS 206(4) OF THE ADVISERS ACT [15 U.S.C. §§ 80b-6(4)] AND RULE 206(4)-8 THEREUNDER [17 C.F.R. § 275.206(4)-8]**
(Against Welliver and Dblaine Capital)

128.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

129.    By their conduct, Welliver and Dblaine Capital, while acting as investment advisers, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative.

130.    By their conduct, Welliver and Dblaine Capital, while acting as investment advisers to a pooled investment vehicle:  (a) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in the pooled investment vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the pooled investment vehicle.

131.     By reason of the foregoing, Welliver and Dblaine Capital violated Section 206(4)

of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §

275.206(4)-8].

## COUNT XI

**AIDING AND ABETTING**
**VIOLATIONS OF SECTIONS 206(4) OF THE ADVISERS ACT [15 U.S.C. §§ 80b-6(4)]**
**AND RULE 206(4)-8 THEREUNDER [17 C.F.R. § 275.206(4)-8]**
(Against Welliver)

132.     Paragraphs 1 through 89 above are realleged and incorporated herein by

reference.

133.     By its conduct, Dblaine Capital, while acting as an investment adviser, directly or

indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in

acts, practices, or courses of business that were fraudulent, deceptive, or manipulative.

134.     By its conduct, Dblaine Capital, while acting as an investment adviser to a pooled

investment vehicle:  (a) made untrue statements of material facts or omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading, to investors or prospective investors in the pooled investment

vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive,

or manipulative with respect to investors or prospective investors in the pooled investment

vehicle.

135.     Welliver knowingly or recklessly provided substantial assistance to Dblaine

Capital in the commission of these violations.

136.     By reason of the foregoing, Dblaine Capital violated 206(4) of the Advisers Act

[15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] and Welliver is

liable for aiding and abetting those violations pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## COUNT XII

### VIOLATIONS OF, AND AIDING AND ABETTING VIOLATIONS OF, SECTION 206(3) OF THE ADVISERS ACT [15 U.S.C. § 80b-6(3)]
(Against Welliver and Dblaine Capital)

137.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

138.    By its conduct, Dblaine Capital, while acting as an investment adviser and while acting as principal for its own account, directly or indirectly, by use of the mails or means or instrumentality of interstate commerce, knowingly purchased a security from a client, without disclosing to such client in writing before the completion of such transaction the capacity in which it was acting and obtaining the consent of the client to such transaction.

139.    Welliver knowingly or recklessly provided substantial assistance to Dblaine Capital in the commission of these violations.

140.    By reason of the foregoing, Dblaine Capital violated Section 206(3) of the Advisers Act [15 U.S.C. §80b-6(3)] and Welliver is liable for aiding and abetting those violations pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## COUNT XIII

### VIOLATIONS OF, AND AIDING AND ABETTING VIOLATIONS OF, SECTION 17(a)(2) OF THE INVESTMENT COMPANY ACT [15 U.S.C. § 80a-17(a)(2)]
(Against Welliver and Dblaine Capital)

141.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

142.    By its conduct, Dblaine Capital, while affiliated with a registered investment company, knowingly purchased from the registered investment company a security other than a security issued by such registered investment company.

143.    Welliver knowingly or recklessly provided substantial assistance to Dblaine Capital in the commission of these violations.

144.    By reason of the foregoing, Dblaine Capital violated Section 17(a)(2) of the Investment Company Act [15 U.S.C. §80a-17(a)(2)] and Welliver is liable for aiding and abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## COUNT XIV

**VIOLATIONS OF, AND AIDING AND ABETTING VIOLATIONS OF, SECTION 17(e)(1) OF THE INVESTMENT COMPANY ACT [15 U.S.C. § 80a-17(e)(1)]**
(Against Welliver and Dblaine Capital)

145.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

146.    By its conduct, Dblaine Capital, while affiliated with a registered investment company and acting as its agent, accepted compensation, other than regular salary or wages from the registered investment company, for the sale of property to such registered investment company.

147.    Welliver knowingly or recklessly provided substantial assistance to Dblaine Capital in the commission of these violations.

148.    By reason of the foregoing, Dblaine Capital violated Section 17(e)(1) of the Investment Company Act [15 U.S.C. §80a-17(e)(1)] and Welliver is liable for aiding and

abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## COUNT XV

## AIDING AND ABETTING VIOLATIONS OF SECTION 22(e)
## OF THE INVESTMENT COMPANY ACT [15 U.S.C. § 80a-22(e)]
(Against Welliver and Dblaine Capital)

149.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

150.    By its conduct, the Trust, a registered investment company, suspended the right of redemption, or postponed the date of payment or satisfaction upon redemption of a redeemable security in accordance with its terms for more than seven days after the tender of such security to the company or its agents designated for that purpose for redemption.

151.    Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

152.    By reason of the foregoing, the Trust violated Section 22(e) of the Investment Company Act [15 U.S.C. §80a-22(e)] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## COUNT XVI

## VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT
## [15 U.S.C. § 80a-33(b)]
(Against Welliver and Dblaine Capital)

153.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

154.     By their conduct, Welliver and Dblaine Capital made untrue statements of material fact, or omitted facts necessary in order to prevent statements made, in light of the circumstances under which they were made, from being materially misleading, in registration statements, applications, reports, accounts, records, or other documents filed or transmitted pursuant to the Investment Company Act.

155.     By reason of the foregoing, Welliver and Dblaine Capital violated Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)].

## COUNT XVII

### AIDING AND ABETTING VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT [15 U.S.C. § 80a-33(b)]
(Against Welliver and Dblaine Capital)

156.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

157.     By its conduct, the Trust made untrue statements of material fact, or omitted facts necessary in order to prevent statements made, in light of the circumstances under which they were made, from being materially misleading, in registration statements, applications, reports, accounts, records, or other documents filed or transmitted pursuant to the Investment Company Act.

158.     Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

159.     By reason of the foregoing, the Trust violated Section 34(b) of the Investment Company Act [15 U.S.C. §80a-33(b)] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## COUNT XVIII

**AIDING AND ABETTING VIOLATIONS OF INVESTMENT COMPANY ACT RULE 22c-1 [17 C.F.R. § 270.22c-1]**
(Against Welliver and Dblaine Capital)

160.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

161.    By its conduct, the Trust, a registered investment company, sold, redeemed, or repurchased its redeemable security at a price other than the price based on the current net asset value of such security that is next computed after receipt of a tender of the security for redemption or of an order to purchase or sell the security.

162.    Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

163.    By reason of the foregoing, the Trust violated Investment Company Act Rule 22c-1 [17 C.F.R. § 270.22c-1] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## COUNT XIX

**AIDING AND ABETTING VIOLATIONS OF INVESTMENT COMPANY ACT RULE 38a-1 [17 C.F.R. § 270.38a-1]**
(Against Welliver and Dblaine Capital)

164.    Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

165.    By its conduct, the Trust, a registered investment company, failed to adopt and implement written policies and procedures reasonably designed to prevent violation of the federal securities laws by the Trust, including policies and procedures that provide for the

31

oversight of compliance by each investment adviser, principal underwriter, administrator, and transfer agent of the Trust.

166.    Welliver and Dblaine Capital knowingly or recklessly provided substantial assistance to the Trust in the commission of these violations.

167.    By reason of the foregoing, the Trust violated Investment Company Act Rule 38a-1 [17 C.F.R. § 270.38a-1] and Welliver and Dblaine Capital are liable for aiding and abetting those violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

## I.

Find that Welliver and Dblaine Capital committed the violations alleged herein and find that, as a result of these violations, Welliver and Dblaine Capital received ill-gotten gains.

## II.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining:

A.    Welliver and Dblaine Capital, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2), (a)(3)], and from aiding and abetting such violations; and

B.    Welliver, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting such violations; and

C.   Dblaine Capital, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) promulgated thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)], and from aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; and

D.   Welliver, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and from aiding and abetting Sections 206(1), 206(2), 206(3) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and

E.   Dblaine Capital, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 206(1), 206(2), 206(3) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and

F.     Welliver, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)], and from aiding and abetting violations of Sections 17(a)(2), 17(e)(1), 22(e) and 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-17(a), 80a-17(e)(1), 80a-22(e), 80-33(b)] and Rules 22c-1 and 38a-1 thereunder [17 C.F.R. §§ 270.22c-1, 270.38a-1]; and

G.     Dblaine Capital, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(2), 17(e)(1) and 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-17(a), 80a-17(e)(1), 80-33(b)], and from aiding and abetting violations of Sections 22(e) and 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-22(e), 80-33(b)] and Rules 22c-1 and 38a-1 thereunder [17 C.F.R. §§ 270.22c-1, 270.38a-1].

## III.

Order Welliver and Dblaine Capital to disgorge their ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon.

## IV.

Order Welliver and Dblaine Capital to pay the SEC civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].

**V.**

Retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as the Court deems just and appropriate.

**JURY TRIAL DEMAND**

The SEC requests a trial by jury.

Respectfully submitted,

Dated: October 18, 2011

s/ Benjamin J. Hanauer
Benjamin J. Hanauer
Thu B. Ta
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 900
Chicago, Illinois 60604
T. 312-353-7390
F. 312-353-7398
hanauerb@sec.gov
tat@sec.gov

James Alexander
Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN
T. 612-664-5600
F. 612-664-5788
Local Counsel