# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States Securities and
Exchange Commission,

       Plaintiff,

v.

David B. Welliver,
Dblaine Capital, LLC,

       Defendants.

**Civil No. 11-CV-3076 (SER)**

**MEMORANDUM AND ORDER**

---

Benjamin J. Hanauer, John E. Birkenheier, Thu E. Ta, Esqs., United States Securities and Exchange Commission, 175 West Jackson Boulevard, Suite 900, Chicago, Illinois 60604, for Plaintiff.

James S. Alexander, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Benjamin R. Skjold, Christopher P. Parrington, Jared D. Kemper, Thomas W. Pahl, Esqs., Foley & Mansfield, PLLP, 250 Marquette Avenue, Suite 1200, Minneapolis, Minnesota 55401, for Defendants.

Patrick D. Boyle, Esq., Law Office of Patrick D. Boyle, 222 South Ninth Street, Suite 3220, Minneapolis, Minnesota 55402, for Defendants.

---

STEVEN E. RAU, United States Magistrate Judge.

This matter is before the Court on Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Partial Summary Judgment [Doc. No. 113] for all charges that do not require a showing of scienter and Defendants' David B. Welliver ("Welliver") and Dblaine Capital, LLC's ("Dblaine Capital") (collectively, "Defendants") Motion for Summary Judgment [Doc. No. 120] as to all claims. The parties consented to proceed before the undersigned magistrate judge. (Joint Consent for Exercise of Jurisdiction by Magistrate Judge

Steven E. Rau) [Doc. No. 108].  For the reasons set forth below, the SEC's Motion for Partial Summary Judgment is granted in part and denied in part and Defendants' Motion for Summary Judgment is denied.

## I.      BACKGROUND

This matter involves the SEC's allegations of fraud, breaches of fiduciary duties, and numerous other violations of federal securities laws to investors of the Dblaine Fund, a mutual fund Defendants advised.  (Compl.) [Doc. No. 1 ¶ 1].  The SEC alleges Defendants entered into an improper *quid pro quo* agreement in October 2010 that ultimately resulted in a total loss to investors.  (Compl. ¶ 2).  As consequence of the *quid pro quo* agreement Defendants obtained $4 million in loans.  (SEC's Mem. in Supp. of Mot. for Partial Summ. J., "SEC's Mem. in Supp.") [Doc. No. 115 at 1].  In exchange for the loans, the SEC alleges, Defendants agreed to invest significant mutual fund assets in "alternative investments" recommended by the lender.  (*Id.*).

Defendants purportedly directed Dblaine Fund to invest in an illiquid private placement offered by the lender's affiliate pursuant to the *quid pro quo* agreement.  (*Id.*).  Later, Defendants allegedly caused Dblaine Fund to make additional investments in the private placement, despite knowing that doing so violated various Dblaine Fund investment restrictions.  (*Id.* at 2).  Furthermore, the SEC claims Defendants failed to follow the fair value procedures the Dblaine Fund described in its SEC filings and internal procedures.  (*Id.*).  The failure to follow those procedures, the SEC alleges, resulted in misrepresentations of the value of the private placement and Dblaine Fund's shares to investors.  (*Id.*).  Within a few short months, the private placement proved worthless, and Dblaine Fund investors lost their entire investment.  (*Id.*).  Despite those losses, Welliver spent at least $869,000 of the $4 million loan money for his own benefit, according to the SEC.  (*Id.*).

2

The SEC's Complaint contains nineteen counts, alleging thirty-two claims of securities violations against Welliver and Dblaine Capital.   The SEC seeks an Order of Permanent Injunction, restraining and enjoining Defendants and their officers, agents, servants, employees, attorneys, and all persons in active convert with them from violating securities laws, regulations and rules.   (Compl. at 32–34).   The SEC also seeks disgorgement of any ill-gotten gains, with prejudgment interest, and payment of the civil penalties pursuant to the Securities Act, the Exchange Act, the Adviser's Act, and the Investment Company Act.   (Compl. at 34).   Finally, the SEC requests the Court to retain jurisdiction to implement and carry out the terms of the all orders and decrees, and other such relief the Court deems just and appropriate.   (Compl. at 35).

### A.        The Formation of Dblaine Capital, Dblaine Fund, and Dblaine Trust

Dblaine Capital was an SEC-registered investment advisory firm Welliver founded in 2005.   (Compl. ¶¶ 15–16); (Am. Answer) [Doc. No. 70 ¶¶ 15–16].   Welliver served as the CEO and Chief Investment Officer with "sole control over Dblaine Capital's operations and advisory services."   (Compl. ¶ 15); (Am. Answer ¶ 15).   Welliver and Dblaine Capital served as investment advisers to the Dblaine Fund.   (Compl. ¶ 15); (Am. Answer ¶ 15).   Welliver also managed the Dblaine Fund's portfolio and, in that capacity, he was responsible exclusively for selecting Dblaine Fund's investments.   (Compl. ¶ 33); (Am. Answer ¶ 33).   Dblaine Capital had the discretionary authority to purchase and sell securities on behalf of Dblaine Fund.   (Tr. of Dep. of Jones dated Apr. 30, 2012, "Jones Apr. 30, 2012 Dep.," Ex. A. at 44, attached to Parrington Aff.) [Doc. No. 123].

Welliver formed an open-end management investment company, Dblaine Investment Trust (the "Dblaine Trust"), in late 2009.   (Compl. ¶ 17); (Am. Answer ¶ 17).   Welliver and Dblaine Capital advised the two funds contained in the Dblaine Trust, one of which was the

Dblaine Fund.  (Compl. ¶ 17); (Am. Answer ¶ 17).  The boards of trustees for the Dblaine Fund and the Dblaine Trust were identical in composition.  (Compl. ¶ 17); (Am. Answer ¶ 17); (Jones Apr. 30, 2012 Dep. at 43–44, 58).

David Jones ("Jones") served as Chief Compliance Officer ("CCO") to Dblaine Capital and Dblaine Trust from February 1, 2010 to June 2011.  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J., "Defs.' Mem.") [Doc. No. 122 at 2–3, 4]; (Jones Apr. 30, 2012 Dep. at 134).  Prior to hiring Jones, Welliver served as CCO to Dblaine Capital and Dblaine Fund.  (Tr. of Dep. of David Welliver dated July 31, 2012, "Welliver July 31, 2012 Dep.," Ex. 9 at 22, attached to Index of Exs. to Pl.'s Mot for Partial Summ. J., "Pl.'s Index") [Doc. Nos. 115–19].  As CCO, Jones reported to Welliver for Dblaine Capital and to Dblaine Fund's Board of Trustees.  (Jones Apr. 30, 2012 Dep. at 43).

## B.    Attempts to Raise Dblaine Fund's Capital and the Agreement with Lazy Deuce

The Dblaine Fund investors in the first year were limited to Dblaine Capital's advisory clients and total assets were less than $500,000.  (Tr. of Dep. of Welliver dated Aug. 3, 2011, "Welliver Aug. 3, 2011 Dep.," Ex. 8 at 67–68, 93–96, attached to Pl.'s Index).  Welliver wanted to grow Dblaine Fund's assets through merger with other mutual funds, which would then allow for an increase in the advisory fees he reaped.  (Welliver July 31, 2012 Dep. at 75).  To achieve that goal, Welliever entered into an agreement in March 2010 with another investment advisor, Bryce Capital Management, LLC ("Bryce"), which served two mutual funds (the "Bryce Funds").  (Bryce Agreement, Ex. 17, attached to Pl.'s Index).  Pursuant to that agreement, Dblaine Capital would pay Bryce $200,000 to merge and acquire the Bryce Funds.  (Bryce Agreement, Ex. 17, attached to Pl.'s Index).  Because Dblaine Capital had insufficient assets to finance that transaction, Welliver sought alternative financing options and ultimately settled on

financing through Lazy Deuce Capital Company ("Lazy Deuce").  (Welliver July 31, 2012 Dep. at 83–84, 88, 90); (Dblaine Capital Statement of Assets, Liabilities, and Equity dated June 30, 2010, Ex. 10, attached to Pl.'s Index).

In May 2010, Welliver introduced a proposal to Brian Baldwin ("Baldwin") from Lazy Deuce.  (Email exchange dated May 24, 2010, Ex. 18, attached to Pl.'s Index).  He suggested that Lazy Deuce invest $1 million in Dblaine Capital, purportedly to allow Dblaine Capital to acquire an additional $50 million of mutual fund assets.  (*Id.*).  Lazy Deuce was unable to obtain the financing until September 2010 when Baldwin sent Welliver an email informing him Lazy Deuce had "the potential to be [his] conduit for cash."  (Email exchange dated Sept. 23, 2010, Ex. 19, attached to Pl.'s Index).

On September 29, 2010, Baldwin emailed a draft letter of intent to Welliver.  (Dep. Tr. of Brian Baldwin, Ex. B at Ex. 61, attached to Second Aff. of Christopher P. Parrington in Supp. of Defs.' Mot. for Summ. J, "Second Parrington Aff.") [Doc. No. 128].  That letter stated that

> 2. Lazy Deuce would provide a loan of up to One Million Dollars to Dblaine Capital to enable it to purchase the rights to manage funds of an amount equal to 50 times the amount of the Lazy Deuce Loan (the "Managed Funds").
> 3. Dblaine Capital would invest an amount equal to five percent (5%) of the Managed Funds in Lazy Deuce (the "Investment").  The Investment would be used to pursue Lazy Deuce's investment banking strategy.

(*Id.*).  Welliver forwarded the proposed letter of intent to Jones, who expressed concern about the proposal as a *quid pro quo* arrangement.  (Jones Apr. 30, 2012 Dep. at 187–191).

The next day, Welliver sent a revised copy of the letter of intent.  (*Id.* at Ex. 26).  It proposed

> 2. Lazy Deuce will provide financing to Dblaine Capital in the amount of up to One Million Dollars. Dbaine Capital will utilize such financing for the sole purpose of acquiring other registered open-end mutual funds.  The goal of Dblaine is to add 50 million in assets under management over the

next 12 months through acquisitions of registered open-end mutual funds, utilizing the provided financing.

3. In Dblaine's capacity as advisor to the Dblaine Fund, and contingent upon the prior approval of the Dblaine Fund's Board of Trustees, Dblaine Capital will reserve 5% of the total Fund assets available for portfolio investments to be invested in securities that would be categorized as "Other Assets or Alternative Investments". Dblaine will engage the services of Lazy Deuce as a consultant to identify, conduct due diligence upon, and recommend such securities to Dblaine for purchase by the Fund. The Other assets section will be managed in accordance with all applicable rules and guidelines of [sic] as set forth in regards to the management of a registered mutual fund. All purchase and sales of the investments would have final approval of the Advisor-Portfolio Manager (Dblaine Capital, LLC). In addition, a separate independent committee of the Dblaine Fund Board would be formed for valuation and oversight.

(*Id.*). Baldwin and Welliver signed a letter of intent on October 3, 2010. (*Id.* at Ex. 29). The final letter of intent added that Lazy Deuce was to "use its best efforts to" provide financing "upon repayment terms mutually agreed to by the parties"; paragraphs two and three were otherwise identical to the provisions above. (*Id.* at Exs. 26, 29).

On October 20, 2010, Dblaine Capital and Lazy Deuce entered into a "consulting services" agreement, wherein Lazy Deuce would identify "suitable investment opportunities" for Dblaine Fund. (Agreement dated Oct. 20, 2010, Ex. 22, attached to Pl.'s Index). The consulting services were to include "investment research and recommendations, ongoing due diligence, projections, pro formas, structuring ideas, investigations, audits, timelines, terms and fees." (*Id.*). The agreement further provided that Dblaine Capital "shall use its reasonable business efforts to select securities for investment by Dblaine Fund in the alternative investment category that are recommended by Lazy Deuce and invest in such securities for Dblaine Fund in amounts not to exceed Dblaine Fund's limitations on such investments [five percent of Dblaine Fund assets]." (*Id.*). The agreement also contained an integration clause, which provides: "This Agreement supersedes all previous and contemporaneous oral negotiations, commitments,

writings and understandings between the parties concerning the matters in this Agreement." (*Id.* ¶ 7(e)).

The agreement did not reference a contemporaneous promissory note memorializing a $100,000 loan from Lazy Deuce to Dblaine Capital. (Promissory Note dated Oct. 20, 2010, Ex. 23 at 27, attached to Pl.'s Index). Welliver did not disclose the letter of intent or subsequent "consulting agreement" to the Boards of Trustees for Dblaine Capital or the Dblaine Fund, believing it was Jones's responsibility to do so. (Welliver Aug. 3, 2011 Dep. at 185–88, 196); (Welliver's Resps. to Pl.'s First Set of Requests for Admis., Ex. 26 at ¶¶ 35, 48, attached to Pl.'s Index); (Welliver July 31, 2012 Dep. at 119–24). Over the next eight months, Lazy Deuce made twenty-six additional loans to Dblaine Capital, totaling $4 million, with most of the loans charging 15% interest. (Promissory Notes dated Oct. 20, 2010 to May 26, 2011, Ex. 23, attached to Pl.'s Index); (Summ. of Promissory Notes between Lazy Deuce and Dblaine Capital, Ex. 24, attached to Pl.'s Index); (Welliver July 31, 2012 Dep. at 121). Welliver did not reveal any of the Lazy Deuce loans to the Boards of Trustees for Dblaine Capital or the Dblaine Fund until late June 2011.[1] (Welliver July 31, 2012 Dep. at 121–22, 124). Rather, Welliver again believed it was Jones's responsibility and relied on him to make those disclosures. (*Id.* at 124–25); (Welliver Aug. 3, 2011 Dep. at 185–86).

By December 13, 2010, following a $100,000 payment from Dblaine Capital to Bryce, the merger between the Dblaine Fund and the Bryce Funds was effectuated. (Compl. ¶ 48); (Am. Answer ¶ 48). As a result of the merger, the Dblaine Fund's assets increased from approximately $500,000 to over $9 million. (Welliver Aug. 3, 2011 Dep. at 96). Following the merger, Welliver invested Dblaine Fund's newly acquired assets pursuant to a large-cap model

---

[1]    One other member of Dbaline Fund's Board of Trustees knew about the loans, but it is unclear how or when he learned of them. (Welliver July 31, 2012 Dep. at 121–22).

described in Dblaine Fund's Prospectus.[2]   (Welliver Aug. 3, 2011 Dep. at 111–12); (Welliver July 31, 2012 Dep. at 133–35).

Shortly before the merger, on December 8, 2010, Frank Delahanty ("Delahanty"), a Lazy Deuce employee, emailed Welliver's attorney stating: "I understand that we can expect returns from the first tranche around the 15th."   (Email exchange dated Dec. 8, 2010, Ex. 27 at 2, attached to Pl.'s Index).   Welliver responded: "The Dblaine Fund will be making an investment, we need to see your prospectus, and what we are investing in."   (*Id.* at 1).   On December 14, 2011, Delahanty sent Welliver a private placement memorandum for Semita Partners LLC (the "Semita PPM").   (Email exchange dated Dec. 8, 2010, Ex. 28, attached to Pl.'s Index).

The Semita PPM is a twenty-one page document describing the Semita offering and associated risk factors.   (*Id.*).   It explains that Semita "was founded on August 14, 2010, and to date we have engaged primarily in commercial lending, developing our technology and marketing our business to potential investors and customers."   (*Id.*).   The Semita PPM identified Baldwin and Delahanty among Semita's "management, Board of Governors, [and] Corporate Officers."   (*Id.* at 4).   By December 2010, Welliver understood that both Baldwin and Delahanty were each affiliated with both Lazy Deuce and Semita, and that "a pretty substantial relationship" existed between the two companies.   (Welliver Aug. 3, 2011 Dep. at 195, 218). The Semita PPM further describes the Semita securities as "restricted"; Welliver understood Semita to be an "illiquid" investment under the terms of Dblaine Fund's Prospectus.   (Email

---

[2]       A prospectus is a disclosure document that describes financial security for potential buyers or investors. *Information Available to Investment Company Shareholders*, United States Securities and Exchange Commission (Apr. 15, 2010), http://www.sec.gov/answers/mfinfo.htm. Commonly, it provides investors with material information about investments, such as descriptions of the company's business, financial statements, biographies of officers or directors, and information about their compensation. *Id.*

exchange dated Dec. 8, 2010, Ex. 28 at 2, attached to Pl.'s Index); (Welliver July 31, 2012 Dep. at 150).

After reviewing the Semita PPM and speaking with Baldwin, Welliver decided to purchase Semita for Dblaine Fund, but wanted Jones to first review the investment. (Welliver July 31, 2012 Dep. at 151–52, 154–57). The same day Welliver received the Semita PPM, he emailed a copy to Jones, explaining that he wanted Dblaine Fund to invest approximately $900,000, and instructed Jones to "let me know if you have any comments." (Email exchange dated Dec. 15, 2010, Ex. 29, attached to Pl.'s Index). Welliver claims he relied on Jones to advise him regarding the wisdom of investing in Semita. (Welliver July 31, 2012 Dep. at 152–53). The next day, December 15, 2010, Jones responded to Welliver's email, writing: "It sure looks like they did a good job of disclosing all of their risks." (Email exchange dated Dec. 15, 2010, Ex. 29, attached to Pl.'s Index). Jones testified that he intended his response to be sarcastic, a reminder to Welliver of the risks of investing in a private placement. (Jones Apr. 30, 2012 Dep. at 222, 230). Welliver responded: "Yes they did plus I will be on top of what they invest in." (Email exchange dated Dec. 15, 2010, Ex. 29, attached to Pl.'s Index).

Around December 16, 2010, Welliver signed an agreement for Dblaine Fund to purchase 1 million Semita units at $1 per unit. (Subscription Agreement, Ex. 30, attached to Pl.'s Index). Whether to make the Semita investment was a matter of Welliver's discretion. (Welliver Aug. 3, 2011 Dep. at 201, 205). On December 16 and 17, 2010, Welliver directed Dblaine Fund to make its first investments in Semita, purchasing a total of 900,000 units for $900,000.[3] (Compl. ¶ 54); (Am. Answer ¶ 54); (Welliver July 31, 2012 Dep. at 182–83). At the time, Dblaine Fund assets

---

[3]     With Fund assets of approximately $9 million, the $900,000 investment violated the five percent diversification restriction in the Fund's Prospectus. (Prospectus at 9–10). The SEC stated at the hearing on these Motions, however, that for purposes of their Motion, they are not taking issue with this violation.

were approximately $9 million.  (Registration Statement for Dblaine Investment Trust (Including Prospectus) dated Dec. 30, 2010 "Prospectus," Ex. 13 at 8–9, attached to Pl.'s Index).  According to Welliver, he directed Dblaine Fund to invest in Semita because of the consulting agreement with Lazy Deuce.  (Welliver Aug. 3, 2011 Dep. at 202–03).

### C.      The Dblaine Fund's Filings with the SEC

#### 1.            Investment Restrictions

The Trust's Prospectus, which was provided to shareholders, described it as a diversified fund with an objective of "growth and income."  (Prospectus at 5, 8).  The Prospectus also stated Dblaine Fund would, under normal circumstances, invest primarily in equity securities that trade on domestic and foreign exchanges at below fair value, as determined by Dblaine Capital.  (*Id.* at 6).    It described three screening strategies that all focused on companies with market capitalization in excess of $150 million, and utilized an "exhaustive fundamental and technical analysis" to determine which stocks to purchase.  (*Id.* at 33–34).

The Prospectus also imposed the following investment restrictions, relating to portfolio concentration, diversification, and illiquid investments:

> 7.  <u>Concentration</u>.  The Fund will not invest 25% or more of its total assets in a particular industry or group of industries.  This limitation is not applicable to investments in obligations issued or guaranteed by the U.S. government, its agencies, or instrumentalities or repurchase agreements with respect thereto.
> 8.  <u>Diversification</u>.  The Fund will not invest in the securities of any issuer if, immediately after such investment, less than 75% of the total assets of the Fund will be invested in case and case items (including receivables), government securities, securities of other investment companies or other securities for the purposes of this calculation limited in respect of any one issuer to an amount (determined immediately after the latest acquisition of securities to the issuer) not greater in value than 5% of the total assets in the Fund and to not more than 10% of the outstanding voting securities of such issuer.
>
> . . .

10

    4.  <u>Illiquid Investments</u>.  The Fund will not hold 15% or more of its net assets in securities for which there are legal or contractual restrictions on resale and other illiquid securities.

(*Id.* at 9–10).  Welliver and the five other trustees signed and filed the Registration Statement, including the Prospectus, on December 30, 2010.  (*Id.* at 1, 92); (Compl. ¶ 89); (Am. Answer ¶ 89).  Welliver reviewed, approved, and understood Dblaine Fund's investment policies and restrictions, including the restrictions on concentration, diversification, and illiquid investments.  (Compl. ¶ 34); (Am. Answer ¶ 34).  He also reviewed and approved Dblaine Fund's Compliance Manual and Dblaine Capital's Compliance Manual.  (Compl. ¶ 34); (Am. Answer ¶ 34).

### 2. Valuation Procedures

According to Dblaine Capital's Compliance Manual, "[o]n a daily basis," Welliver, was "responsible for ensuring that [the Dblaine Fund was] complying with its respective investment restrictions, as defined by applicable law and regulation and/or disclosure in offering documents."  (Dblaine Capital Compliance Manual, Ex. 14 at 25, attached to attached to Pl.'s Index).  Dblaine Fund's Compliance Manual outlined procedures for pricing and valuation of its holdings.  (Dblaine Investment Trust Compliance Program Manual, Ex. 34 at 2, attached to Pl.'s Index).  According to those procedures, "securities for which market quotations are readily available are valued at current market value, and all other securities are valued at fair value as determined in good faith by the Trust's Board of Trustees."  (*Id.*).  The Compliance Manual further stated that Dblaine Fund's Board should establish a Fair Value Committee to perform and monitor Dblaine Fund's fair value procedures.  (*Id.* at 4).  "Fair value" of a portfolio security was defined as "the amount that the owner of the security or asset might reasonably expect to receive upon its current sale."  (*Id.* at 10).  Dblaine Capital also played a role in the fair value process according to the Dblaine Fund's Compliance Manual:

> Adviser personnel are generally the best source of expertise regarding valuation matters, and are especially important to the identification and resolution of specific pricing problems. Appropriate personnel of the adviser must regularly review the Fund's security valuations, and the adviser must notify the administrator promptly if it reasonably believes that a particular valuation may not reflect fair market value.

(*Id.* at 6). Dblaine Capital was also charged with "monitor[ing] the valuation of securities [it] manage[s] and immediately notify[ing] the administrator if it reasonably believes the value of any security should be determined by the Fair Value Committee." (*Id.* at 9). The Dblaine Fund's Compliance Manual also directed Dblaine Capital to provide Dblaine Fund's Fair Value Committee with "a valuation recommendation specifying the information supporting the recommendation," and "review the appropriateness of the valuation based on any new information or assumptions regarding the security" and present its proposed pricing methodology to the Fair Value Committee in writing. (*Id.* at 10–12).

Similarly, the Prospectus provided that Dblaine Fund's assets were "generally valued at their market value using market quotations, unless market quotes are unavailable." (Prospectus at 4). The Prospectus continued: "If market prices are not readily available or, in [Dblaine Capital's] opinion, market prices do not reflect fair value. . . . [Dblaine Capital] will value the [Dblaine] Fund's assets at their fair value according to policies approved by Dblaine Fund's Board of Trustees." (*Id.*).

Dblaine Fund made the same representation in its Form N-CSR, a report sent to shareholders and filed with the SEC on May 9, 2011. (Dblaine Investment Trust Form N-CSR dated May 9, 2011, "N-CSR Form," Ex. 35 at 16–17, attached to Pl.'s Index). The Form N-CSR stated that: "The [Dblaine] Fund has a policy that contemplates the use of fair value pricing to determine the NAV [net asset value] per share of the [Dblaine] Fund when market prices are unavailable." (*Id.*). Welliver reviewed and approved the Form N-CSR before signing and filing

it on behalf of Dblaine Fund.  (*Id.* at 27); (Welliver Aug. 3, 2011 Dep. at 244); (Compl. ¶ 89); (Am. Answer ¶ 89).

Dblaine Fund's administrator, Commonwealth Shareholder Services, Inc. ("Commonwealth"), performed the "ministerial calculations necessary to calculate the each [sic] Fund's net asset value daily." (Accounting Services Agreement between Dblaine Investment Trust and Commonwealth Fund Accounting dated July 1, 2010, Ex. 36 at B-1, attached to Pl.'s Index).  Dblaine Fund's contract with Commonwealth, however, made clear that for restricted securities, Commonwealth would perform its NAV calculations based on valuation provided by Dblaine Fund:

> all portfolio securities shall be given such values as the [Fund] shall direct by instructions from the [Fund's] Pricing Committee, including all restricted securities and other securities requiring valuation not readily ascertainable solely by the use of such a Pricing Service.

(*Id.* at B-2).  Welliver reviewed and signed the Commonwealth contract on behalf of Dblaine Fund.  (*Id.* at 8); (Welliver July 31, 2012 Dep. at 248–49).

### D.    Initial Redemptions Following the Merger

In December 2010, with the exception of Semita, Welliver had invested Dblaine Fund's $9 million in a diversified large-cap portfolio.  (Compl. ¶ 56); (Am. Answer ¶ 56); (Welliver Aug. 3, 2011 Dep. at 110–11).  Shortly after the Semita investments, Dblaine Fund experienced significant redemptions when many former Bryce Fund shareholders began withdrawing from Dblaine Fund. (Compl. ¶ 55); (Am. Answer ¶ 55); (Welliver Aug. 3, 2011 Dep. at 96–97).  These investors liquidated their Dblaine Fund holdings on the advice of their investment adviser, a successor to Bryce, who raised "due diligence issues" after investigating Welliver and Dblaine Capital.  (Letter dated Dec. 17, 2010, Ex. 31, attached to Pl.'s Index).  Welliver likewise decided to move Dblaine Capital's pre-merger advisory clients out of Dblaine Fund, because Dblaine

Fund had begun to significantly deviate from the large-cap model described in the Prospectus. (Compl. ¶ 55); (Am. Answer ¶ 55); (Welliver Aug. 3, 2011 Dep. at 101–02). Accordingly, the only investors left in Dblaine Fund were Bryce Fund shareholders who had not liquidated their holdings. (Welliver Aug. 3, 2011 Dep. at 100–02).

To satisfy the redemption requests, Dblaine Fund sold most of its large-cap portfolio, but not the Semita investment, and placed the proceeds in a money market account. (Compl. ¶ 56); (Am. Answer ¶ 56); (Welliver Aug. 3, 2011 Dep. at 110–12). By January 5, 2011, Dblaine Fund's reported net assets declined to $3.4 million, including the Semita investment, still valued at $900,000. (Compl. ¶ 57); (Am. Answer ¶ 57); (Dblaine Fund Portfolio Analysis dated Jan. 5, 2011, Ex. 32, attached to Pl.'s Index); (Welliver Aug. 3, 2011 Dep. at 99–101). Dblaine Fund's illiquid Semita holding now comprised over 26% of Dblaine Fund's reported net assets, exceeding the investment limitations contained in the Prospectus relating to diversification (5%), concentration (25%), and illiquid securities (15%). (Compl. ¶ 57); (Am. Answer ¶ 57); (Dblaine Fund Portfolio Analysis dated Jan. 5, 2011, Ex. 32, attached to Pl.'s Index); (Prospectus at 67–68). By the end of January 2011, Welliver knew the Semita holdings violated Dblaine Fund's investment restrictions. (Welliver Aug. 3, 2011 Dep. at 145, 249–50, 256).

### E.    April Investments in Semita

After discovering the Semita holding exceeded the restrictions, Welliver consulted with Jones and Commonwealth. (Welliver Aug. 3, 2011 Dep. at 250); (Welliver July 31, 2012 Dep. at 187–89). Jones advised Welliver of two options to address the impact of the redemptions on Dblaine Trusts's compliance: (1) acquire new assets for Dblaine Trust to increase its holdings or (2) reduce Dblaine Trust's Semita holdings. (Jones Apr. 30, 2012 Dep. at 134); (Welliver July 31, 2011 Dep. at 188–89).

14

Over the next few months, Welliver sought assets to add to Dblaine Fund and made several attempts to sell the Semita holding, including an attempt to sell the investment back to Lazy Deuce.  (Compl. ¶ 59); (Am. Answer ¶ 59); (Welliver Aug. 3, 2011 Dep. at 257–59).  He was unable to do either.  (Welliver Aug. 3, 2011 Dep. at 257–58).  During that period, the redemptions continued and, by March 31, 2011, Dblaine Fund's reported net assets fell another million to approximately $2.4 million.  (Compl. ¶ 60); (Am. Answer ¶ 60); (Dblaine Fund Portfolio Analysis dated Mar. 31, 2011, Ex. 33, attached to Pl.'s Index).  Dblaine Fund's only holdings at that time were approximately $1.5 million in a money market account and the Semita investment—which was still valued at $900,000 and had grown to 37% of Dblaine Fund's reported assets.  (Dblaine Fund Portfolio Analysis dated Mar. 31, 2011, Ex. 33, attached to Pl.'s Index).

In anticipation of an expected $10 million investment from an unknown Lazy Deuce investor into Dblaine Fund, Welliver directed Dblaine Fund to purchase 375,000 Semita units for $375,000 and 450,000 Semita units for $475,000 on April 1 and 15, 2011, respectively.  (Compl. ¶ 62); (Am. Answer ¶ 62); (Welliver Aug. 3, 2011 Dep. at 258); (Welliver July 31, 2012 Dep. at 206–07).  At the time of the April Semita purchases, Welliver knew Semita was not the best investment compared to other available investments.  (Welliver Aug. 3, 2011 Dep. at 260–61).  He also knew that the additional purchases further violated Dblaine Fund's investment restrictions.  (Welliver Aug. 3, 2011 Dep. at 259, 262).  At an April 12 board meeting, Welliver did not inform the Board of Trustees about the April 1 Semita investment, the anticipated April 15 Semita investment, or the violations of Dblaine Fund's restrictions.  (Welliver Aug. 3, 2011 Dep. at 259–60); (Welliver July 31, 2012 Dep. at 229–30).  Welliver assumed Jones would tell the Board of Trustees.  (Welliver July 31, 2012 Dep. at 229–30).  Jones testified that was not

involved in the decision-making process regarding the April Semita investments and did not learn of them until mid-April. (Jones Apr. 30, 2012 Dep. at 238–240, 242, 244–45). One week after the April Semita investments, Lazy Deuce loaned Dblaine Capital an additional $1.1 million at an annual interest rate of 15%. (Compl. ¶ 64); (Am. Answer ¶ 64); (Promissory Notes between Dblaine Capital and Lazy Deuce, Ex. 23 at 2–3, attached to Pl.'s Index).

Sometime in April, Welliver learned Dblaine Fund was the only investor in Semita and became concern about the Semita investment. (Welliver Depo. Tr. dated July 31, 2012, Ex. D. at 191, attached to Parrington Aff.). Welliver's concern lead him to try to "come up with a plan to get Semita out of [the Dblaine] Fund." (*Id.*). He tried "very hard" to rid Dblaine Fund of the Semita holding, but was unsuccessful. (*Id.* at 192). Despite his concern and the struggle to unload Semita, Welliver directed Dblaine Fund to sell 500,000 Semita units to Dblaine Capital for $500,000 on May 27, 2011. (Welliver July 31, 2012 Dep. at 187–90, 230, 234). Welliver took this measure in an effort to bring Dblaine Fund into compliance with the investment restrictions. (*Id.*). Welliver informed Jones of this transaction, but did not reveal it to Dblaine Fund's Board or seek approval. (Welliver Aug. 3, 2011 Dep. at 271–72); (Welliver July 31, 2012 Dep. at 236–37). According to Jones's testimony, he did not tell Dblaine Trust's Board of Trustees about this further investment because Welliver assured Jones he was in regular contact with the Board and was going to keep them apprised. (Jones Apr. 30, 2012 Dep. at 244).

### F.    Continued Redemption Requests

By June 20, 2011, as a result of continued redemptions, Dblaine Fund's only assets other than Semita were approximately $3,000 in a money market fund. (Dblaine Fund Portfolio Analysis dated June 20, 2011, Ex. 44, attached to Pl.'s Index). Around that time, Dblaine Fund became unable to process redemption requests because it held insufficient liquid assets. (Tr. of

Dep. of Karen Shupe dated May 1, 2012, Ex. 45 at 231–32, attached to Pl.'s Index).   For instance, on July 14, 2011, an investor attempted to redeem approximately $30,000 of Dblaine Fund shares, based on Dblaine Fund's published NAV of $11.64, but Dblaine Fund had insufficient assets to process the request.   (Dblaine Fund Summ. Account Statement (City National Bank) and Attachments dated July 15, 2011, Ex. 46, attached to Pl.'s Index).

### G.    Valuation of Dblaine Fund's Semita Holding

Dblaine Fund never established a Fair Value Committee.  (Welliver Aug. 3, 2011 Dep. at 276); (Welliver July 31, 2012 Dep. at 243).  Instead, from the initial purchase in December 2010 until July 2011, Dblaine Fund continuously valued Semita at the purchase price of $1 per share. (Welliver Aug. 3, 2011 Dep. at 275); (Welliver July 31, 2012 Dep. at 246).  Prior to late June 2011, Welliver never revised that valuation, consulted with Dblaine Fund's Board of Trustees about the valuation of Semita, or advised the Dblaine Fund Board of Trustee of any valuation concerns.   (Welliver Aug. 3, 2011 Dep. at 275–76); (Welliver July 31, 2012 Dep. at 246). Because Dblaine Fund continuously valued the Semita holding at $1 per share, Commonwealth used that valuation in its daily calculation of Dblaine Fund's NAV. (Dblaine Fund Portfolio Analysis dated Mar. 31, 2011, Ex. 33, attached to Pl.'s Index); (Dblaine Fund Daily NAV Worksheet dated Mar. 31, 2011, Ex. 37, attached to Pl.'s Index); (Dblaine Fund Daily NAV Worksheet dated July 15, 2011, Ex. 38, attached to Pl.'s Index).

Following Dblaine Capital's May 27, 2011 purchase of Semita from Dblaine Fund, Welliver attempted unsuccessfully to liquidate Dblaine Fund's remaining Semita holding "many times."  (Welliver Aug. 3, 2011 Dep. at 269).  In June, Welliver met Jones to discuss issues facing Dblaine Capital, and Jones raised "a lot of concerns" about Dblaine Fund's valuation of Semita.  (Welliver Aug. 3, 2011 Dep. at 273–74).  In a June 23, 2011 email to Lazy Deuce,

Welliver referred to Semita as "a bad investment." (Email exchange dated June 23, 2011, Ex. 39 at 1, attached to Pl.'s Index).

On June 27, 2011, Jones wrote the Board members to request an emergency meeting to address Dblaine Fund's Semita investment, referring to the issue as "the most serious situation I have ever personally encountered." (Email exchange dated June 27, 2011, Ex. 40 at 2, attached to Pl.'s Index). Jones informed the Board of his resignation as Dblaine Capital's CCO, stating that he could then "serve the [Dblaine] Fund without conflict." (*Id.*). The next day, when Jones learned Welliver convened a Board meeting, but Jones was not invited to participate, Jones also resigned as CCO of Dblaine Trust. (*Id.*).

In early July 2011, Dblaine Fund hired Jay Salmen ("Salmen") to determine the value of the Semita holding. (Welliver Aug. 3, 2011 Dep. at 276–77). Around the same time, the SEC initiated an examination of Dblaine Capital. (Letter dated July 1, 2011, Ex. 42, attached to Pl.'s Index). On July 7, 2011, Salmen issued a report recommending that Dblaine Fund "establish a 100% loss reserve with respect to its holdings in Semita," effectively valuing the holding at zero. (Email exchange dated July 7, 2011, Ex. 41, Attached to Pl.'s Index); (Welliver Aug. 3, 2011 Dep. at 273, 277). Salmen's decision to value the Semita holding at zero was premised on his determination that Semita did not have "active operations" or any investors other than Dblaine Fund and Dblaine Capital. (Email exchange dated July 7, 2011, Ex. 41, Attached to Pl.'s Index).

Dblaine Fund continued to value Semita at $1 per share until July 18, 2011, when the Board voted to write-down the holding to zero. (Welliver Aug. 3, 2011 Dep. at 277–78); (Dblaine Fund Daily NAV Worksheet dated July 15, 2011, Ex. 38, attached to Pl.'s Index); (NAV Worksheet dated July 18, 2011, Ex. 43, attached to Pl.'s Index). As a result of the devaluation, Dblaine Fund's daily reported net holdings decreased overnight approximately

$1.25 million to $24,000 and its per-share NAV declined from $11.64 to $0.23. (NAV Worksheet dated July 18, 2011, Ex. 43, attached to Pl.'s Index). On June 28, 2011, Dblaine Trust stopped selling shares. (Letter from Welliver to Charles J. Kerstetter dated Aug. 30, 2011, Ex. 1 at 1, attached to Pl.'s Index).

### H.     Termination of the Dblaine Fund's Operations

On August 11, 2011, Dblaine Fund's Board voted to terminate its operations. (Compl. ¶ 84); (Am. Answer ¶ 84); (Email from Karen Shupe to Will Schaefer dated Aug. 17, 2011, Ex. 47, attached to Pl.'s Index). As of that day, Dblaine Fund reported net assets of approximately $54,000 and a NAV of $0.49. (Compl. ¶ 83); (Am. Answer ¶ 83). On August 17, Dblaine Fund issued a letter to shareholders informing them the assets of Dblaine Fund were zero, and for that reason Dblaine Fund "is being closed." (Email from Karen Shupe to Will Schaefer dated Aug. 17, 2011, Ex. 47, attached to Pl.'s Index). Dblaine Fund's approximately eighty investors all saw their investments in Dblaine Fund become worthless. (List of Shareholders for Dblaine Fund dated Aug. 1, 2011, Ex. 48, attached to Pl.'s Index).

### I.     Welliver's Letter to the SEC

On August 30, 2011, Welliver responded to a letter from the SEC informing him that it intended to recommend an enforcement action. (Letter from Welliver to Charles J. Kerstetter dated Aug. 30, 2011, Ex. 1, attached to Pl.'s Index). Welliver's response claimed he relied on Jones as CCO of Dblaine Capital and Dblaine Fund. (*Id.* at 5). He noted that he and Dblaine Capital were "responsible for [their] actions and if Mr. Jones gave [them] bad advice, [they we]re responsible for acting upon it." (*Id.*). Welliver continued that any reliance on Jones was "not intended to indicate an abrogation of my and [Dblaine Capital]'s responsibilities to recognize our obligations to assure the [Dblaine Fund's] assets are properly valued." (*Id.* at 6).

J.       **Welliver's Spending**

The SEC alleges that From October 20, 2010 to June 21, 2011, Welliver spent at least

$869,000 of the money Dblaine Capital received from Lazy Deuce on personal expenditures,

which he classified as "personal loans" in Dblaine Capital's accounting system.  (Welliver July

31, 2012 Dep. at 65–66, 255–58, 297); (Excel Spreadsheet of Dblaine Capital QuickBooks File

"Loan to Employee" Account dated Feb 2000 to May 2011, Ex. 49, attached to Pl.'s Index);

(Decl. of Jean Javorski., Ex. 52 ¶ 7, attached to Pl.'s Index).  As of July 31, 2012, Welliver had

not repaid Dblaine Capital for his personal loans, and still owed Dblaine Capital in excess of $1

million. (Welliver July 31, 2012 Dep. at 78–79).   At that time, Welliver did not have the

financial ability to repay his loans from Dblaine Capital.  (*Id.* at 294–95).

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue if the

pleadings, depositions, interrogatory answers, admissions, and affidavits show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–84 (1990).

On a motion for summary judgment, the Court views the evidence in the light most favorable to

the nonmoving party.  *Lujan*, 497 U.S. at 903; *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir.

1995).  The nonmoving party may not "rest on mere allegations or denials but must demonstrate

on the record the existence of specific facts which create a genuine issue for trial."  *Krenik v.

Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (citation and quotation omitted).

Where, as here, the Court confronts cross-motions for summary judgment, this approach

is only slightly modified.  When considering the SEC's Motion, the Court views the record in the

light most favorable to Defendants.  When considering Defendants' Motion, the Court views the

record in the light most favorable to the SEC. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." *Sachsenmaier v. Supervalu, Inc.*, No. 10-cv-4868 (SRN/AJB), 2012 WL 1313495, at \*4 (D. Minn. Apr. 17, 2012) (citation and quotation omitted).

## III.   DISCUSSION

Though listed as nineteen counts, the SEC's Complaint asserts thirty-two claims.[4]   In the Court's view, the SEC's Complaint is an overzealous exercise of its authority as a securities market regulator; this misplaced zeal makes discussing and disposing of those counts meriting early resolution (through settlement conference or motion practice) more cumbersome and

---

[4]     Count One (Violation of Section 17(a)(1) of the Securities Act); Count Two (Aiding and Abetting Violation of Section 17(a)(1) of the Securities Act); Count Three (Violation of Section 17(a)(2) of the Securities Act, Violation of Section 17(a)(3) of the Securities Act); Count Four (Aiding and Abetting Violation of Section 17(a)(2) of the Securities Act, Aiding and Abetting Violation of Section 17(a)(3) of the Securities Act); Count Five (Violation of Section 10(b) of the Exchange Act, Violation of Rule 10b-5 [17 C.F.R. § 240.10b-5] Under Section 10(b) of the Exchange Act); Count Six (Violation of Section 10(b) of the Exchange Act, Violation of Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] Under Section 10(b) of the Exchange Act, Violation of Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] Under Section 10(b) of the Exchange Act); Count Seven (Aiding and Abetting Violations of Section 10(b) of the Exchange Act, Aiding and Abetting Violation of Rule 10b-5 [17 C.F.R. § 240.10b-5] Under Section 10(b) of the Exchange Act); Count Eight (Violation of Section 206(1) of the Advisers Act, Violation of Section 206(2) of the Advisers Act); Count Nine (Aiding and Abetting Violation of Section 206(1) of the Advisers Act, Aiding and Abetting Violation of Section 206(2) of the Advisers Act); Count Ten (Violation of Section 206(4) of the Advisers Act, Violation of Rule 206(4)-8 Under Section 206(4) of the Advisers Act); Count Eleven (Aiding and Abetting Violation of Section 206(4) of the Advisers Act of the Advisers Act, Aiding and Abetting Violation of Rule 206(4)-8 Under Section 206(4) of the Advisers Act); Count Twelve (Violations of Section 206(3) of the Advisers Act, Aiding and Abetting Violations of Section 206(3) of the Advisers Act); Count Thirteen (Violations of Section 17(a)(2) of the Investment Company Act, Aiding and Abetting Violations of Section 17(a)(2) of the Investment Company Act); Count Fourteen (Violations of Section 17(e)(1) of the Investment Company Act, Aiding and Abetting Violations of Section 17(e)(1) of the Investment Company Act); Count Fifteen (Aiding and Abetting Violations of Section 22(e) of the Investment Company Act); Count Sixteen (Violations of Section 34(b) of the Investment Company Act); Count Seventeen (Aiding and Abetting Violations of Section 34(b) of the Investment Company Act); Count Eighteen (Aiding and Abetting Violations of the Investment Company Act Rule 22c-1); and Count Nineteen (Aiding and Abetting Violations of the Investment Company Act Rule 38a-1).

complicated than necessary.   In fact, the Court expressed concern about this at the initial scheduling conference with the SEC and Defendants' first set of lawyers in February 2012.  That concern was ignored obviously.  While proportionality is a new concept to the Federal Rules of Civil Procedure and discovery, it should not be new to regulators.[5]

The Complaint contains both primary and aiding-and-abetting securities violations.  The analysis below begins with discussion of the distinction between liability for primary violations and aiding-and-abetting violations.   Then, the claims are divided into those that require a showing of scienter and those that do not.  The claims that do not require scienter are then further grouped into four categories based on the facts underlying the purported violations.

## A.        Primary Violation Versus Aiding and Abetting Violation

Securities regulations establish liability for primary offenders and those who aid and abet primary offenders.  The Complaint contains several claims for both primary and aiding-and-abetting offenses.   While the securities laws lay out the requirements of primary offenses, the Eighth Circuit has a three-pronged approach to determining liability for aiding and abetting the commission of securities violations.  *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991).  First, the court asks whether a primary party has committed a securities law violation.  *Id.*  "A primary violation is a *sine qua non* for aiding and abetting liability; without a primary violation, an aiding and abetting claim fails."[6]  *Ligon v. Deloitte, Haskins & Sells*, 957 F.2d 546, 547 (8th Cir. 1992)

---

[5]        Here, the losses to investors are complete and amount to well over a million dollars. Nevertheless, between Defendants and the SEC, more than fifteen lawyers have noted appearance in this case.  The case has 135 docket entries.  A "wasting" liability policy insured Defendants, but will be depleted soon, leaving nothing for the investors the insurance purportedly protected.   The allocation of legal resources and efforts are, as alleged above, misplaced and deprive those most deserving of any relief.

[6]        In some cases, courts have assumed the existence of a primary violation in their analysis on aiding and abetting claims where a defendant conceded a primary violation, the defendant's argument assumes the existence of a primary violation, or the SEC has adduced sufficient

(citation omitted).   Second, the court assesses the aider and abetter's "knowledge" of the violation.   *Camp*, 948 F.2d at 459.   Third, the court evaluates whether the aider and abetter substantially assisted the primary violator in committing the violation.   *Id.*  The second and third elements—knowledge and substantial assistance—are inversely related, "where there is a minimal showing of substantial assistance, a greater showing of scienter is required."   *Id.* (citation and quotation omitted).   The "exact level" of knowledge is fact-dependent, but negligence is insufficient.   *Id.*

Determining whether a party rendered substantial assistance and weighing that assistance vis-à-vis the party's knowledge is a particularly fact-specific analysis that does not lend itself well to summary disposition.   Such an analysis requires comparing evidence and explanations, weighing them, and evaluating credibility—not the stuff of which summary judgment orders are made.   Thus, neither the SEC's or Defendants' Motions for summary judgment on claims for aiding and abetting will be granted where reasonable jurors could differ regarding the Defendants' knowledge and/or substantial assistance.

### B.      Scienter-Based Counts

The scienter required for a Section 10(b) or Rule 10b–5 claim "refers to a mental state embracing intent to deceive, manipulate, or defraud."   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Fl. State Bd. of Admin v. Green Tree*, 270 F.3d 645, 653 (8th Cir. 2001) (citations omitted).   This Circuit applies the same standard for violations of Section 17(a) of the Securities Act.   *See SEC v. Brown*, 579 F. Supp. 2d 1228, 1235–36 (D. Minn. 2008) (JRT/FLN) (citations omitted).   Traditionally, there are three methods of establishing scienter:

---

evidence to give rise to a question of fact, thereby relieving the Court of further inquiry on that element.   *K & S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 977 (8th Cir. 1991); *Metge v. Baehler*, 762 F.3d 621, 624 (8th Cir. 1985).

facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud"; facts showing "severe recklessness"; or specific allegations of motive and opportunity.[7]   *In re K-tel Int'l, Inc., Sec. Litig.*, 300 F.3d 881, 893–94 (8th Cir. 2002).   Thus, although mere negligence or even gross negligence is not sufficient to establish scienter, severe recklessness may be sufficient.   *See SEC v. Shanahan*, 646 F.3d 536, 543 (8th Cir. 2011).

> The Eighth Circuit defines recklessness as:

> highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Green Tree Fin. Corp.*, 270 F.3d at 654.   "It is insufficient to show that a defendant should have known that a material misstatement or omission was false or misleading."   *Shanahan*, 646 F.3d at 544.   This definition of recklessness requires plaintiff to prove "something more egregious than even 'white heart/empty head' good faith."   *Shanahan*, 646 F.3d at 543–44 (citation omitted).

The issue of whether a particular intent existed is generally a question of fact for the jury, and not appropriate for determination on summary judgment.   *See, e.g.*, *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962)) ("It is well-established that summary judgment is inappropriate to decide questions of scienter, knowledge and intent."); *K–tel*, 300 F.3d at 894 (citation omitted).   In "rare cases," where "there is overwhelming evidence of severe

---

[7]   The Supreme Court has repeatedly deferred addressing whether, in some circumstances, reckless behavior is sufficient for civil liability under" Section 10(b) and Rule 10b–5.   *See S.E.C. v. Shanahan*, 646 F.3d 536, 543–44 (8th Cir. 2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 1323–24 (2011) (assuming, "without deciding," a "deliberate recklessness" standard was sufficient to establish scienter for purposes of Section 10(b) and Rule 10b–5).   But the Eighth Circuit, as well as most other federal circuits, recognizes that a plaintiff may satisfy the scienter requirement "with proof of severe recklessness."   *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008)

recklessness and the defendants fail to bring forward countervailing evidence," scienter may be established on summary judgment. *Brown*, 579 F. Supp. 2d at 1236 (citing *SEC v. Lyttle*, 538 F.3d 601, 602–05 (7th Cir. 2008)).

As the SEC alleges them, the following primary claims require scienter as an element of proof: Count One (Violation of Section 17(a)(1) of the Securities Act); Count Five (Violation of Section 10(b) of the Exchange Act, Violation of Rule 10b-5 [17 C.F.R. § 240.10b-5] Under Section 10(b) of the Exchange Act); Count Six (Violation of Section 10(b) of the Exchange Act, Violation of Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] Under Section 10(b) of the Exchange Act, Violation of Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] Under Section 10(b) of the Exchange Act; and Count Eight (Violation of Section 206(1) of the Advisers Act).[8]  The following aiding and abetting claims relate to those primary violations requiring a showing of scienter: Count Two (Aiding and Abetting Violation of Section 17(a)(1) of the Securities Act); Count Seven (Aiding and Abetting Violations of Section 10(b) of the Exchange Act, Aiding and Abetting Violation of Rule 10b-5 [17 C.F.R. § 240.10b-5] Under Section 10(b) of the Exchange Act); and Count Nine

---

[8]     *See SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (Count One); *SEC v. True N. Fin. Corp.*, No. 10-cv-3995 (DWF/JJK), 2012 WL 5471063, at *20 (D. Minn. Nov. 9, 2012) (citing *Shanahan*, 646 F.3d at 541) (Counts Five and Six); *SEC v. Brown*, 658 F.3d 858, 863 (8th Cir. 2011) (citing *SEC v. Steadman*, 967 F.2d 636, 641 n.3 (D.C. Cir. 1992) (Count Eight's Section 206(1) violation).
    Defendants' assertion that the SEC must establish scienter on Count Three is erroneous. (Defs.' Mem. at 28).  The claimed relevance of scienter with respect to those claims is based on the fact that it may have a bearing on the appropriateness of injunctive relief. (*Id.* at 28–29).  As the Supreme Court explained in *Aaron v. SEC*, 446 U.S. 680 (1980), scienter may be an "aggravating or mitigating factor[]" to be taken into account" as the court exercises equitable discretion in deciding whether to grant injunctive relief.  446 U.S. at 701.  Scienter is not, however, an element required to establish a primary violation of those claims.  *See Shanahan*, 646 F.3d at 545.  The SEC seeks summary judgment only on the issue of liability, not relief. (SEC's Reply in Supp. of Its Mot. for Partial Summ. J. at 3 n.2) [Doc. No. 133].  Therefore, its absence or presence is not dispositive of the availability of summary judgment on Count Three.  Furthermore, even if it were potentially dispositive at this stage, a fact question remains regarding scietner.

(Aiding and Abetting Violation of Section 206(1) of the Advisers Act). If a fact question regarding scienter precludes summary judgment on the underlying primary claims, summary judgment must also be denied as to the corresponding aiding and abetting claims. *Ligon*, 957 F.2d at 547.

Defendants argue that Welliver's reliance on the advice of Jones exculpates their conduct related to the scienter-based claims. (Defs.' Mem. at 30–32, 33–34). Nevertheless, the SEC has established material factual issues regarding intent and reliance. Accordingly, summary judgment for Defendants as to the scienter-based claims, both primary and aiding and abetting, is inappropriate.

While a jury could ultimately determine that Defendants' conduct was merely negligent and reflects a good-faith attempt to comply with governing rules and securities regulations as to these claims, summary judgment is inappropriate because a reasonable jury could also find Defendants acted with scienter or aided and abetted Dblaine Fund's primary violations. For example, a jury could conclude Defendants acted with scienter by crediting the testimony of Lazy Deuce's employees and finding that Defendants knew that the funds invested in Semita would simply pass through to Lazy Deuce's debtors. *See* (Tr. of Dep. of Baldwin dated May 24, 2012, "Baldwin May 24, 2012 Dep.," Ex. 4 at 149–52, attached to Index of Exs. to SEC's Resp. to Defs.' Mot. for Summ. J.) [Doc. No. 129]; (Tr. of Dep. of Frank Delahanty dated Aug. 28, 2012, Ex. 5 at 218–19, attached to Index of Exs. to SEC's Resp. to Defs.' Mot. for Summ. J.). A reasonable jury could also find that the April investments in Semita were, at minimum, severely reckless because Welliver knew the investments further violated the investment restrictions. (Welliver Aug. 3, 2011 Dep. at 260, 262). Similarly, a jury might conclude Defendants acted with scienter in failing to comply with Dblaine Fund's valuation procedures, resulting in an

inflated value assigned to Semita.  (Welliver Aug. 3, 2011 Dep. at 276); (Welliver July 31, 2012 Dep. at 243).

Additionally, Defendants' purported good faith reliance on Jones is not persuasive.  Such reliance is not a complete defense to the alleged securities fraud claims; it is simply a means of demonstrating good faith and represents possible evidence of a lack of intent to defraud.[9]  *See United States v. Peterson*, 101 F.3d 375, 381 (5th Cir. 1996) (reliance on counsel).  To the extent such a "defense" applies to the scienter-based claims, a trier of fact must be allowed to decide whether to credit this explanation.  A jury may reject Defendants' claimed reliance, particularly given the Defendants' experience in securities and the facts of this case.  For example, a jury may find that Welliver's service as Dblaine Capital's Chief Compliance officer for over four years indicates he had a working familiarity with securities regulations.  (Dblaine Trust Board of Trustees Meeting Minutes dated Nov. 30, 2009, Ex. 16 at 16–17, attached to Pl.'s Index).

In sum, and as it relates to Defendants' Motion, the Court finds that summary disposition is not appropriate for any count that requires scienter as a necessary element.  Relatedly, to the extent Defendants assert a reliance defense to any scienter-based count, the fact of reliance and the reasonableness thereof is also a fact-intensive analysis not susceptible to summary disposition.

---

[9]    Although *Peterson* relates to a defendant's good faith reliance on counsel, the notion that reliance is not an affirmative defense has been extended to other professionals in securities cases.  *See U.S. S.E.C. v. Snyder*, 292 Fed App'x 391, 406 (5th Cir. 2008) (accountant).  This Court finds no meaningful distinction between reliance on counsel or reliance on accountant and reliance on Jones as CCO.  Like *Peterson* and *Snyder*, Defendants' theory in this matter provides an explanation of their conduct which tends to negate the element of scienter.  A jury remains free to decide for itself whether the facts demonstrate that the Defendants acted with scienter in light of the advice received from Jones, attorneys, or accountants.

### C.        Non-Scienter-Based Claims

Both parties moved for summary judgment on the counts that do not require a showing of scienter.  The non-scienter-based claims may be grouped according to the four time periods or events on which the claims are founded: (1) claims based on the alleged *quid pro quo* agreement; (2) claims based on the investment guidelines and valuation of the Semita investments; (3) claims based on Semita investments, including the May 27, 2011 purchase; and (4) claims based on the Dblaine Fund's failure to redeem.

### 1.        Claims Based on the Alleged *Quid Pro Quo Agreement*: Counts Eight to Eleven and Fourteen

Many of the Counts are premised on, and presume the existence of, the alleged *quid pro quo* agreement.  To conclude parties entered into such an agreement requires a finding of a specific intent to do something or to give or receive some item of value in exchange for some other conduct or item.  One cannot negligently enter into a *quid pro quo* agreement.  In other words, although a violation of the controlling securities regulations may be established by a showing of negligence, the facts underlying the claims presume a specific intent to enter into a *quid pro quo* agreement.  Because the record contains conflicting material facts regarding the existence of such an agreement, summary judgment for claims premised on the alleged *quid pro quo* agreement must be denied.

According to the SEC, despite the language of the letter of intent and agreement, the true arrangement between Lazy Deuce and Dblaine Capital was *quid pro quo*.  In support of their argument, the SEC submitted Baldwin's testimony that Welliver initially approached him in late 2009 to ask for a loan; he did not seek help selecting stocks or due diligence services at that time. (Baldwin May 24, 2012 Dep. at 40–41).  Given the lending climate and his company's business model, however, Baldwin and Lazy Deuce were unable to assist Defendants.  (*Id.* at 41–43).

Welliver again approached Baldwin in May 2010 and proposed that Lazy Deuce invest $1 million, purportedly to allow Dblaine Capital to acquire an additional $50 million of mutual fund assets. (Email exchange dated May 24, 2010, Ex. 18, attached to Pl.'s Index); (Baldwin May 24, 2012 Dep. at 46–50). Like his late 2009 proposal, Welliver's suggested arrangement did not request Lazy Deuce's assistance in selecting stocks or performing due diligence. (Baldwin May 24, 2012 Dep. 4 at 50–51). Email exchanges between Welliver and Baldwin dated four months after Welliver's second proposal continued to describe a loan from Lazy Deuce and a corresponding investment back into Lazy Deuce by Dblaine Capital, but no duty for Lazy Deuce to advise Dblaine Capital on stock selection or perform due diligence on its behalf. (Email exchange dated Sept. 24, 2010, Ex. 9, attached to Index of Exs. to SEC's Resp. to Defs.' Mot. for Summ. J.).

The record also contains testimony from Delahanty regarding the alleged *quid pro quo* agreement. Delahanty testified Baldwin told him about an agreement with Dblaine Capital in late 2010. (Tr. of Dep. of Delahanty dated Aug. 28, 2012, Ex. B at 200–04, attached to Second Aff. of Parrington in Supp. of Defs.' Opp'n to Pl.'s Mot. for Summ. J.) [Doc. No. 128]. According to Delahanty's testimony, Baldwin and Welliver agreed that Lazy Deuce would loan money to Dblaine Capital and, in exchange, Dblaine Capital would cause Dblaine Fund to invest in Lazy Deuce. (*Id.* at 200–02). In addition, pursuant to a promissory note, Dblaine Capital would repay the loans with 15% interest. (*Id.* at 201–04). Because Delahanty did not see the letter of intent or final agreement, he was not sure whether he learned of the agreement before or after those documents were signed. (*Id.* at 200). Finally, the SEC also noted that Welliver testified that he directed Dblaine Fund to make the December and April investments in Semita because of the agreement with Lazy Deuce. (Welliver Aug. 3, 2011 Dep. at 202–03, 262–63).

Defendants deny a *quid pro quo* agreement.  They admit that Lazy Deuce proposed an arrangement wherein it would loan funds to Dblaine Capital and, in exchange, Dblaine Capital would invest 5% of Dblaine Trust's assets into Lazy Deuce.  (Defs.' Mem. at 10–11); (Baldwin Dep. Tr. dated May 24, 2012, Ex. B at Ex. 61, attached to Parrington Aff.).  But, Defendants claim that upon receipt of the proposal, Jones expressed concerns about the arrangement and the document was revised as a result.  (Jones Apr. 30, 2012 Dep. at 187–88, 189–90, Exs. 23, 25, 26, 29).  They note the final letter of intent between Lazy Deuce and Dblaine Capital describes Lazy Deuce's role as that of a "consultant" for 5% of Dblaine Capital's funds.  (Jones Apr. 30, 2012 Dep. at Ex. 29 at 1).  Similarly, Defendants point to the final agreement, which states that Lazy Deuce would provide "consulting services" to Dblaine Capital.  (Agreement 1 dated Oct. 20, 2010, Ex. 22, attached to Pl.'s Index).  Defendants argue that previous discussions and negotiations are irrelevant and inadmissible because those documents capture their final agreement.[10]

---

[10]   To the extent Defendants' Motion relies on the parol evidence rule, it is denied on an alternative basis.  Defendants argue the parol evidence rule bars any evidence suggesting a *quid pro quo* agreement existed based on exchanges prior to the execution of the final agreement.  (Defs.' Mem. in Opp'n at 4–5, 14, 21).  Defendants applied Minnesota law in their memorandum, (Defs.' Mem. at 35–37), and the SEC did not challenge that application.  Finding no reason to conclude any other state's law controls, the Court applies Minnesota law for analysis of the parol evidence argument.  *See Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1059 (8th Cir. 1995) (finding that federal courts must apply the parol evidence rule in accordance with controlling state law); *see also SEC v. Bilzerian*, 378 F.3d 1100, 1109 (D.C. Cir. 2004) (rejecting application of Florida's parol evidence rule where contract was unambiguous).  Minnesota's parol evidence rule provides that "the terms of a final and integrated written expression may not be contradicted by parol evidence of previous understandings and negotiations for the purpose of varying or contradicting the writing."  *Mies Equip., Inc. v. NCI Bldg. Sys., L.P.*, 167 F. Supp. 2d 1077, 1082–83 (D. Minn. 2001) (citing *Apple Valley Red-E-Mix Inc. v. Mills-Winfield Eng'g Sales, Inc.*, 436 N.W.2d 121, 123 (Minn. Ct. App. 1989)); *see also* Minn. Stat. § 336.2-2020.  To consider a prior oral statement for the purpose of varying or modifying the written terms of an agreement, when the parties have memorialized their agreement in writing, an exception to the parol evidence rule must apply.  Minn. Stat. § 336.2-202; *Mies Equip.*, 167 F. Supp. 2d at 1082.  One exception to the parol evidence rule is the

Based on the evidence submitted by the parties, the Court finds that a question of material fact remains as whether the true nature of the agreement was *quid pro quo*. A trier of fact must determine the parties' intentions based on the evidence. Although a jury could rely on the language of the final agreement to conclude that Lazy Deuce's role was that of consultant, a reasonable jury also could disregard the wording of the letter of intent and agreement, finding the "consulting" provisions to be pretense. Indeed, a jury could instead credit the evidence submitted by the SEC to conclude that the arrangement was *quid pro quo* and the agreement signed by Welliver and Lazy Deuce was a sham. To the extent the existence of a *quid pro quo* agreement is a necessary predicate to the Parties' Motions, summary judgment is denied to those claims.

**2.      Claims Based on the Investment Guidelines and Valuation of the Semita Investments: Counts Three, Four, Sixteen, Seventeen, Eighteen, and Nineteen**

**i.      Claims Based on Untrue Statements of Material Fact to Potential Investors: Counts Three and Four**

Section 17(a) of the Securities Act states, in relevant part, that:

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

---

admission of evidence to show a contract a sham, used to mislead or deceive a third party. *See Hield v. Thyberg*, 347 N.W.2d 503, 508 (Minn. 1984). Another exception under Minnesota law provides that "a stranger to a contract is not bound by the parol evidence rule unless the stranger seeks to enforce rights which are based on the instrument." *Anderson v. Anderson*, No. A08-1365, 2009 WL 1852613, at *3 (Minn. Ct. App. June 30, 2009) (citing *Hous. & Redevelopment Auth. v. First Ave. Realty Co.*, 270 Minn. 297, 301, 133 N.W.2d 645, 649 (1965)). Both exceptions apply and do not support summary judgment, but rather create a material issue of fact. The SEC offers the extrinsic evidence to show that, despite the language of the Agreement, Defendants and Lazy Deuce entered into an illegal *quid pro quo* arrangement. Furthermore, the SEC is not a party to the agreement and does not seek to enforce rights provided for therein.

. . .

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Unlike § 17(a)(1), § 10(b), or Rule 10b-5 violations described previously, violations of § 17(a)(2) and (3) require only proof of negligence.[11] *Shanahan*, 646 F.3d at 545. To prove a violation of § 17(a)(2) or (3), the SEC must show that Defendants "acted negligently" in their purported omissions or misstatements, meaning that they failed to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation. *Id.* at 545–46; *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986); *see also SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–454 (3d Cir. 1997).

To prove a violation of Section 17(a)(2), the untrue statement or omission must relate to a material fact. 15 U.S.C. 77q(a)(2). A misrepresentation or omission is material for purposes of securities violations if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix of information made available.'" *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, (1988)); *see also Shanahan*, 646 F.3d at 543 (citing *Basic, Inc.*, 485 U.S. at 231–32). A statement can be "false or incomplete,"

---

[11]     As explained above, Defendants incorrectly assert Count Three requires scienter. *See supra* footnote 8; (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J at 17–18). Scienter is simply an element for the Court to consider in determining the appropriateness of injunctive relief as to these claims, however. *Aaron*, 446 U.S. at 701. It is not an element required for proving violations of Section 17(a)(2)–(3). *Shanahan*, 646 F.3d at 545.

but not actionable "if the misrepresented fact is otherwise insignificant." *Basic Inc.*, 485 U.S. at 238. Immaterial facts, in contrast, consist of information or misrepresentations that would not "swa[y]" a "reasonable investor." *Parnes*, 122 F.3d at 546. "Immaterial statements include vague, soft, puffing statements or obvious hyperbole." *K–tel*, 300 F.3d at 897 (internal citation omitted).

Courts may grant summary judgment on charges involving a materiality requirement. *See Brown*, 579 F. Supp. 2d 1228; *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (misstatement material as a matter of law); *SEC v. Onyx Capital Advisors, LLC*, 2012 U.S. Dist. LEXIS 146388, *19–21 (E.D. Mich. Oct. 11, 2012) (same); *Beatty v. Bright*, 318 F. Supp. 169, 173 (S.D. Iowa) (same). For example, where the misrepresentations "are so obviously important to the [investor] that reasonable minds could not differ on the question of materiality, summary judgment is appropriate." *Beatty*, 318 F. Supp. at 173. Materiality, however, is a "mixed question of law and fact" that requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Thus, in many cases, courts concluded that materiality is a factual question for a jury to decide. *Parnes*, 122 F.3d at 546.

The misrepresentations regarding Dblaine Trust are striking and the facts underlying this patently misleading conduct are undisputed. The Prospectus described Dblaine Fund as "diverse" and listed the restrictions placed on the investments to achieve that end. (Prospectus at 8, 9–10). This information lulled potential investors into a sense of safety, leading them to believe their money would be invested consistent with the fundamental goals and limitations laid out. Similarly, the Prospectus and Dblaine Trust's Compliance Manual also provided that if market prices were unavailable or did not reflect fair value, or in other limited instances where

some event materially affected fair value, Dblaine Capital would value Dblaine Fund's assets according to the policies approved by the Board of Trustees. (Dblaine Investment Trust Compliance Program Manual, Ex. 34 at 4, attached to Pl.'s Index). The Board of Trustees approved procedure was the establishment of a fair value committee. (*Id.* at 2, 4). Defendants intended these documents to instill confidence in investors and potential investors by assuring them shares would be valued fairly. Welliver and Dblaine Capital knew the valuation procedures were not observed and a fair value committee never convened. (Welliver Aug. 3, 2011 Dep. at 276); (Welliver July 31, 2012 Dep. at 243). Nevertheless, versions of the Prospectus and Compliance Manual correcting the misrepresentations never issued.

Also, the misrepresentations regarding diversification, investment restrictions, and valuation—individually and collectively—were material and would have affected a reasonable investor's decision to invest in Dblaine Fund. It would be material to a reasonable investor that his or her money was not invested as represented, in safe investment strategies, but rather, in higher-risk, undiversified ventures. *See Smart*, 678 F.3d at 857 (citing *Basic, Inc.*, 485 U.S. at 231–32). Likewise, it would be material to a reasonable investor to learn that Dblaine Fund was not only failing to comply with fair value pricing procedures, but that failure resulted in a gross overstatement of Semita's value and Dblaine Fund's holdings. Indeed, from the purchase in December 2010 to July 2011, Semita was valued at acquisition cost: $1 per share. Commonwealth used this value in its daily calculation of Dblaine Fund's NAV. Then, in early July 2011, Salmen recommended establishing Semita as a "100% loss."[12]  (Ex. 41; Ex. 8 at 277). Overnight, the Semita holdings plummeted from $1 per share to $0. Consequently, Dblaine

---

[12]     Nevertheless, the Fund continued to value Semita at $1 per share until July 18, 2011, when the Board of Trustees voted to write down the holding to zero. (Ex. 8 at 277-78; Ex. 38; ex 43).

Fund's daily reported holdings decreased from approximately $1.25 million to $24,000, and its per-share NAV plunged from $11.64 to $0.23.   (Ex. 43).   Taken as a whole, Defendants' misrepresentations lured investors to Dblaine Fund through false promises about the investment plan and valuation procedures.

Defendants failed to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.   Welliver signed each of the documents on behalf of Dblaine Capital and had actual knowledge of the requirements therein.   (Compl. ¶ 89); (Am. Answer ¶ 89); (Prospectus at 1, 92); (N-CSR Form at 27); (Accounting Services Agreement between Dblaine Investment Trust and Commonwealth Fund Accounting dated July 1, 2010, Ex. 36 at 8, attached to Pl.'s Index).   Welliver also knew that, despite the requirements of the valuation procedures, no fair value committee was established. As early as January 2011, he also knew of violations of the investment restrictions.   (Welliver Aug. 3, 2011 Dep. at 276); (Welliver July 31, 2012 Dep. at 243).   Not only did Welliver fail to rectify those violations or notify investors, he compounded the violation by investing further funds into Semita in April and May.

Furthermore, to the extent Welliver did not have direct knowledge of the falsity of Semita's value, the Court concludes he had constructive knowledge that Semita was overvalued and acted recklessly in failing to verify the accuracy of the valuation.   *See Wills*, 472 F.Supp. at 1263; *see, e.g.*, *SEC v. Wills*, 472 F. Supp. 1250, 1263 (D.D.C. 1978) (actual or constructive knowledge that book value is overstated constitutes grounds for liability).   As noted above, Welliver knew that a fair value committee never convened to establish proper valuation of Semita and that Semita was reported at $1 per share from acquisition in December 2010 to early July 2011.  He testified that he became concerned with the investment in April when he learned

Dblaine Fund was the only investor. (Welliver Depo. Tr. dated July 31, 2012, Ex. D. at 191, attached to Parrington Aff.). Despite that concern, Welliver did not seek to have Semita revalued. Instead, he attempted to sell the Semita shares.

Welliver spent the next several months unsuccessfully attempting to liquidate the Semita holdings, including at attempt to sell them back to Lazy Deuce. (Compl. ¶ 59); (Am. Answer ¶ 59); (Welliver Depo. Tr. dated July 31, 2012, Ex. D. at 192–93, attached to Parrington Aff.). This lack of potential purchasers would have lead anyone with a basic understanding of supply and demand to consider a revaluation of the Semita holdings. Indeed, the inability to sell the shares back to Lazy Deuce should have served as a more alarming warning than an inability to sell the shares to a third party. Ultimately, Welliver directed Dblaine Capital to purchase Semita shares from Dblaine Fund in an effort to bring it into compliance with investment restrictions. Defendants failed to comply with the valuation procedures and acted with reckless disregard as to the fair value of the holdings.

Defendants do not offer any evidence to support their opposition to the SEC's Motion on these claims. They merely deny that a reasonable investor would find the information material and contend that the materiality question must be resolved by a jury, concluding that "numerous fact disputes at issue with these claims." (Defs.' Resp. at 18–20). A properly submitted summary judgment motion cannot be defeated by "mere allegation[s] or denials." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also* Fed. R. Civ. P. 56(e). Rather, to withstand summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Defendants have failed to do so and the Corut will not scour the record to find the fact disputes Defendants argue save them.

As an final point on the SEC's Motion, the Court finds that because Welliver was CEO and Chief Investment Officer with "sole control over Dblaine Capital's operations and advisory services" during the relevant period and he acted as signatory on behalf of Dblaine Capital on the relevant documents, his conduct is attributable to Dblaine Capital.  (Compl. ¶ 15); (Am. Answer ¶ 15).  Welliver signed the Registration Statement, which included the Prospectus, on behalf of Dblaine Trust as "Trustee, President, Principal Executive Officer, Treasurer, Principal Financial and Accounting Officer."  (Prospectus at 92).  Additionally, Defendants served as Dblaine Trust's portfolio manager and investment adviser, and had exclusive authority to purchase and sell its securities.  Based on the control maintained over Dblaine Trust, the Court finds the Defendants' culpability is greater than that of an aider and abetter, and concludes they were primary offenders.

To the extent Defendants claim their blanket defense of reliance on Jones warrants summary judgment, their argument is unpersuasive.  (Defs.' Resp. at 15–17).  Although the scienter-based claims are denied, in part, because the Court concludes a fact question remains as to the reliance and the reasonableness of that reliance, that defense does not apply with the same import to claims that do not require scienter.  Non-scienter-based claims do not require the Court to find a defendant acted with the specific intent to defraud, as scienter claims do.  Rather, non-scienter claims are generally founded on a defendant's negligence or severely reckless conduct.  Furthermore, even in the context of scienter-based claims, reliance is not a complete defense, but rather a factor for the Court to consider.  *Peterson*, 101 F.3d at 381.  Defendants' negligence and severe recklessness regarding the misrepresentations identified above was sufficient to overcome any purported reliance on Jones as to these claims.  Defendants were well aware of the failure to comply with the applicable provisions, but were at least negligent in failing to correct the

misrepresentations.[13]   In addition, Welliver acted with severe recklessness in failing to investigate Semita's value when he faced difficulty unloading it.  Defendants cannot escape liability for this knowledge, and their subsequent negligence and severe recklessness, by claiming it was Jones's responsibility to do something about violations.

In sum, Defendants negligently made misrepresentations to investors that "are so obviously important to the [investor] that reasonable minds could not differ on the question of materiality" in violation of Section 17(a)(2) and (a)(3) of the Securities Act.  *Beatty*, 318 F. Supp. at 173.  Having concluded Defendants are primarily liable for these violations, the Court declines to address the SEC's alternative claims, alleging aiding-and-abetting violations of the same section.  Accordingly, the SEC is entitled to summary judgment on Count Three; SEC's Motion on Count Four and Defendants' Motion as to Counts Three and Four are denied.

---

[13]       Defendants' claim reliance on Jones's statements regarding the April investments in exchange for the expected $10 million.  *See* (Jones Apr. 30, 2012 Dep. at 240–243).  Although Jones told Welliver he had until "May, drop date end of June" to accept the $10 million loan and reach compliance with the investment restrictions, he was not involved in the decision-making process regarding the April Semita investments.  The record evidence provides that Jones did not become aware of them until mid-April, after the first payment occurred.  (*Id.* at 238–240, 242).

Moreover, Welliver did not have an adequate amount of information on which to direct the April Semita investments.  He was approached by Baldwin, who told him about an individual affiliated with Lazy Deuce who had the potential and interest of investing $10 million in Dblaine Trust.  (Defs.' Mem. at 24).  Based on that information alone, Welliver directed the $850,000 investments in Semita.  Welliver never knew the name or identity of the individual, he "just took [Lazy Deuce] for their word that they were going to be honest," and the investment would be made quickly.  (*Id.*); (Welliver July 31, 2012 Dep. at 212–13).  No reasonable investor would make such a financial commitment (and take on the associated risk of further noncompliance with the investment restrictions) without more information.  Claimed reliance on Jones that Defendants had until the end of June to comply with investment restrictions is insufficient to overcome their blind faith in Lazy Deuce.

### ii.   Claims Based on Untrue Statements of Material Fact in Filings to the SEC: Counts Sixteen and Seventeen

Investment Company Act Section 34(b) makes it unlawful for "any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed" with the SEC.  15 U.S.C. § 80-a33.  Scienter is not an element of a Section 34(b) claim.  *In re Matter of Lammert, Soderberg, & Newcomb*, SEC No. 3-12386, 2008 WL 1867960, at *16 (Apr. 28, 2008).  Any false or misleading statement in a mutual fund's prospectus or other SEC filing that violates Securities Act Action 17(a)(2) and Advisers Act Section 206(4) will likewise violate Investment Company Act Section 34(b).  *In re OppenheimerFunds, Inc.*, SEC No. 3-14909, 2012 SEC LEXIS 1765, at *20–22 (June 6, 2012).

These claims are based on the same conduct described in Counts Three and Four, except they address the liability of Defendants for filing documents containing those material misrepresentations with the SEC.  As noted above, the related facts are not in dispute.  The Prospectus filed with the SEC contained false and misleading statements regarding Dblaine Fund's investment restrictions related to investment strategy; valuation policies employed by Dblaine Trust; and portfolio concentration, diversification, and illiquid investment.  Similarly, the Form N-CSR contained false and misleading statements about Dblaine Trust's valuation policies and the value assigned to Semita.  Because the Court previously concluded those statements are material, both of these SEC filings violated Section 34(b).

The Complaint alleges both primary and aiding and abetting liability for a violation of Section 34(b).  Again, as explained above, Defendants are primarily liable under the Investment Company Act for that filing.  *See also SEC v. Daifortis*, 874 F. Supp. 2d 870, 997–88 (N.D. Cal. 2012) (holding Chief Investment Officer for investment advisor of underlying fund liable for 34(b) violation, even if he was not responsible for filing or transmitting the documents).

Finally, for the reasons cited in the discussion of Counts Three and Four, Defendants' conduct overcomes any claimed reliance on Jones and summary disposition for the SEC is appropriate.  SEC's Motion is granted as to Count Sixteen; the Court denies SEC's Motion as to Count Seventeen and Defendants' Motion as to these Counts.

### iii.    Claim Based on Misstatement of NAV: Count Eighteen

Investment Company Act Rule 22c-1 provides that "[n]o registered investment company issuing any redeemable security . . . shall sell, redeem or repurchase any such security except at a price based on the current net asset value of such security . . . ."  17 C.F.R. § 270.22c-1(a).  In determining net asset value, a fund's portfolio holdings for which market quotations are not readily available "shall be valued at fair value as determined in good faith by the board of directors."  17 C.F.R. § 270.2a-4(a)(1); *DH2, Inc. v. SEC*, 422 F.3d 591, 593 (7th Cir. 2005). Under the applicable SEC guidance, Accounting Series Releases 113 and 118, "good faith" valuation requires determining the price at which the fund would expect to receive for the security upon its "current sale."  *In re Parnassus Inv.*, 1998 SEC LEXIS 1877, *36–41 (SEC Sept. 3, 1998) (quoting ASR 113 and 118).  Indeed, the "'current sale' principle set forth in Accounting Series Releases 113 and 118 is the standard to measure [Defendants'] exercise of good faith in their decisions associated with the attempts to fair value the [Dblaine Fund] holdings."  *Id.* at *42.  "A Rule 22c-1 violation occurs when NAV is misstated."  *Id.* at *51. Dblaine Trust represented the Semita shares at a price other than the true net asset value, in violation of Rule 22c-1.  The issue here is whether Defendants had sufficient knowledge of that violation to establish aiding and abetting liability.

As described above, Dblaine Trust failed to follow its policies governing the valuation of Semita and, consequently, Dblaine Trust's NAV reflected that inaccurate—and inflated—value for Semita.  After the initial purchase of Semita at $1 per share, the Semita shares were never revalued.  Welliver's unsuccessful attempts to sell the Semita shares, his realization that Dblaine Capital was Semita's only investor, and his mounting concern about Semita were not enough to cause Defendants to convene a fair value committee.  Dblaine Trust continued to misstate Semita's value, which was, in turn, reflected in its NAV.  Accordingly, SEC's Motion is granted as to Count Eighteen.  Once more, Defendants' Motion is based on their claimed reliance on Jones.  It is denied for the reasons identified above in the discussion on Counts Three and Four.

### iv.    Claim Based on Failure to Comply with Written Valuation Procedures to Convene Fair Value Committee: Count Nineteen

Investment Company Act Rule 38a-1 requires that a mutual fund adopt and implement written policies and procedures reasonably designed to prevent violations of the federal securities laws by the fund.  17 C.F.R.§ 270.38a-1(a)(1).  A fund violates Rule 38a-1 when it fails to follow its own written valuation procedures.  *In re UBS Global Asset Mgmt.*, 2012 SEC LEXIS 141, *4 (SEC Jan. 17, 2012); *Morgan Asset Mgmt.*, 2011 SEC LEXIS 2127 at *23–24.

The evidence before the Court demonstrates that Dblaine Trust violated Investment Company Act Rule 38a-1 of the Investment Company Act.  Neither party disputes that Dblaine Fund failed to convene a fair value committee or determine a fair value for Semita.  Accordingly, for purposes of Count Nineteen, the Court assumes prong one of the aiding-and-abetting test—a primary party's violation—is satisfied.  *See Camp*, 948 F.2d at 459.  Defendants advised the two funds in the Dblaine Trust and were signatories to the written valuation procedures.  Accordingly, they had knowledge of this violation.  Their failure to convene a fair value

41

committee, despite the valuation procedures clear requirements, overcomes any claimed reliance on Jones.  Defendants cannot be permitted to possess knowledge of a violation, yet avoid aiding-and-abetting liability, by claiming someone else should have been first to raise the violation. Thus, Defendant's Motion as to Count Nineteen is denied; the SEC's Motion is granted.

### 3. Claims Based on the May 27, 2011 Semita Purchase: Counts Twelve and Thirteen

Section 206(3) of the Advisers Act makes it unlawful for an investment adviser

> acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction.

15 U.S.C. § 80b-6.  Similarly, Investment Company Act Section 17(a)(2) prohibits any affiliated person of a mutual fund, acting as a principal, from knowingly purchasing securities from the fund. 15 U.S.C. § 80a-17(a)(2); *Lessler v. Little*, 857 F.2d 866, 873 (1st Cir. 1988).  As Dblaine Trust's advisers, Welliver and Deblaine Capital were "affiliated person[s]."  15 U.S.C. § 80a-2(a)(3).

The facts related to this claim are undisputed.  In May 2011, Dblaine Capital purchased $500,000 in Semita shares from Dblaine Trust at Welliver's direction and without the consent of Dblaine Fund.  (Welliver Depo. Tr. dated July 31, 2012, Ex. D. at 192–93, 230, 234, attached to Parrington Aff.); (Jones Apr. 30, 2012 Dep. at 242–44); (Welliver Aug. 3, 2011 Dep. at 272); (Welliver July 31, 2012 Dep. at 236–37).  According to Jones's testimony, he did not tell Dblaine Trust's Board of Trustees about this further investment because Welliver assured Jones

he was in regular contact with the Board and was going to continue to keep them apprised. (Jones Apr. 30, 2012 Dep. at 244).   Defendants have not identified any material fact to dispute these Counts.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Defendants' Motion on these Counts is unfounded and meritless.   Their Motion on Counts Twelve and Thirteen is denied; the SEC's Motion is granted as to those Counts.

###     4.     Claims Based on the Dblaine Fund's Failure to Redeem: Count Fifteen

Investment Company Act Section 22(e) prohibits a mutual fund from suspending the right of redemption for more than seven days.[14]  15 U.S.C. § 80a-22(e).  There is no scienter requirement for a Section 22(e) violation, which typically occurs when a fund cannot honor redemption requests because it lacks the adequate funds.  *SEC v. Fiscal Fund, Inc.*, 48 F. Supp. 712, 713 (D. Del. 1943).

The  facts  related  to  the  primary  violation—Dblaine  Trust's  inability  to  satisfy redemptions within seven days of the request—are undisputed.  Beginning in June 2011, Dblaine Trust was unable to honor redemption requests because it had insufficient assets.  (Tr. of Dep. of Karen Shupe dated May 1, 2012, Ex. 45 at 231–32, attached to Pl.'s Index); (Dblaine Fund Summary Account Statement (City National Bank) and Attachments dated July 15, 2011, Ex. 46, attached to Pl.'s Index).  It has since terminated operations, postponing the right of redemption indefinitely.   (Compl. ¶ 84); (Am. Answer ¶ 84); (Email from Karen Shupe to Will Schaefer dated Aug. 17, 2011, Ex. 47, attached to Pl.'s Index).

As an adviser to Dblaine Trust, Welliver knew of the redemptions and remaining assets. (Welliver Aug. 3, 2011 Dep. at 96–97, 145).  He knew that within one month of the Bryce Fund

---

[14]       The statute provides for certain exceptions that are inapplicable in this matter.  *See* 15 U.S.C. § 80a-22(e)(1)–(3).

merger in December 2010, fifty percent of the Bryce Fund shareholders redeemed their shares in Dblaine Trust for approximately half of Dblaine Trust's total value at that time, $5 million. (Jones Apr. 30, 2012 Dep. at 134).   Nevertheless, Welliver directed additional Semita investments, further limiting Dblaine Trust's inability to maintain the liquidity to process the requests.  The May 2011 investment in Semita is particularly egregious because it occurred after Welliver began to have doubts about Semita and should have known it was overvalued.  By continuing to invest in Semita, despite knowledge of the mounting redemption requests in comparison to the limited assets, Defendants aided and abetted Dblaine Fund's violation of Investment Company Act Section 22(e).  The SEC's Motion as to Count Fifteen is granted.

## IV.    CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

> **1.**   SEC's Motion for Partial Summary Judgment [Doc. No. 113] is **GRANTED in part** and **DENIED in part**.
>
>> **i.**   The Motion is **GRANTED** to the extent it seeks summary judgment as to: Counts Three, Twelve, Thirteen, Fifteen, Sixteen, Eighteen, and Nineteen.
>>
>> **ii.**   The Motion is **DENIED** to the extent it seeks summary judgment as to: Counts One, Two, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Fourteen, and Seventeen.
>
> **2.**   Defendants' Motion for Summary Judgment [Doc. No. 120] is **DENIED**.

Dated: April 30, 2013

 *s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge